[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-12997

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALFONZO LEWIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cr-00369-WMR-UNA-1

_____

Before GRANT, LUCK, and HULL, Circuit Judges.

HULL, Circuit Judge:

On appeal, Alfonzo Lewis challenges his convictions for conspiracy to possess with intent to distribute, and possessing with intent to distribute, five kilograms of cocaine. After careful review and with the benefit of oral argument, we affirm.

Lewis's four claims on appeal focus on three discrete portions of his criminal proceeding: the initial arrest, the jury selection, and the trial itself. For that reason, we describe the set of facts relevant to each issue, discuss that issue, and then move on to the next issue and its pertinent facts.

## PART ONE: THE ARREST

### I. Factual Background

#### A. The Traffic Stop

On December 14, 2015, Michael Hannan was monitoring a pole camera at the office used by the High Intensity Drug Trafficking Area task force, which is under the Drug Enforcement Administration (the "DEA task force"). This type of specialized DEA task force operates in "critical drug-trafficking regions of the United States" using the combined resources of federal, state, and local law enforcement agencies.[1] Hannan was employed by the

---

[1] *See* HIDTA, U.S. Drug Enf't Admin., http://dea.gov/operations/hidta (last visited June 14, 2022).

Fulton County Sheriff's Office ("FCSO") but was also a deputized DEA task force officer.

In November 2015, the DEA task force had placed the camera that Officer Hannan was monitoring at a residential address in East Point, Georgia, as part of an investigation into a large-scale methamphetamine-trafficking organization. While watching the camera feed, Hannan observed a black Chevy Suburban pull into the driveway of the East Point residence. Hannan watched the Suburban's occupants walk toward the house with a brown backpack. He later learned that one of these men was Lewis. The Suburban was registered to the mother of Lewis's child.

Officer Hannan believed a drug deal was occurring, so he contacted Lieutenant Corey Henry of the FCSO. Lt. Henry was not a DEA task force member. Officer Hannan, who was a task force member, informed Lt. Henry that there was a chance a vehicle would be leaving a residence with narcotics, and he asked Lt. Henry if he was available to make a "walled-off stop."

According to Officer Hannan, a "walled-off stop is a law-enforcement technique . . . where a state or local officer in a marked unit is used to assist in conducting a traffic stop on a vehicle that we believe is involved in some type of illegal activity." Officer Hannan explained that the federal task force used walled-off stops "to separate our overall larger investigation from the stop of the vehicle to basically not disclose our—reveal our investigation and compromise our investigation." Officer

Hannan asked Lt. Henry if he could make a traffic stop on the Suburban if he could obtain probable cause through a traffic violation, and if he did find anything, to handle the arrest.

Officer Hannan instructed Lt. Henry to go to a MARTA station[2] near the East Point residence and wait there. Officer Hannan and other DEA task force officers went to the MARTA station as well and continued surveilling the residence on a laptop. Eventually, Officer Hannan saw the two men return to the Suburban and watched as Lewis placed a brown bag in the back seat before getting into the passenger's seat. Officer Hannan provided Lt. Henry with a description of the Suburban and its occupants, as well as its license plate number, and told him a brown bag was placed into the Suburban.

Officer Hannan saw the Suburban drive by the MARTA station about 30 seconds after it left the view of the camera. He and other DEA task force officers—in several different, unmarked cars—began following the Suburban. Lt. Henry, in his marked patrol car, followed at the back of the surveillance team. The Suburban got onto 85 South, and Officer Hannan followed it for "a while." Once the group was "far enough away" from the residence that a stop would not raise suspicion about the larger investigation, Officer Hannan "let Lieutenant Henry know that

---

[2] The Metropolitan Atlanta Rapid Transit Authority, or MARTA, is Atlanta's public transportation system.

any time he's ready, you know, he could get closer and try to observe if there's any traffic violations."

Lt. Henry then moved closer to the Suburban and, using his calibrated speedometer (he did not have a radar gun), determined that the Suburban was traveling 83 miles per hour in an area where the speed limit was 70 miles per hour. He did not pull the Suburban over right away because he was waiting for Georgia State Patrol (GSP) Trooper Jordan Ennis to assist. FCSO officers do not have authority to pursue a fleeing vehicle, but GSP troopers do. So, Lt. Henry had contacted Ennis from the MARTA station. Trooper Ennis arrived sometime after Lt. Henry had determined that the Suburban had been speeding. By that time, Lt. Henry had slowed down and backed off the Suburban. Once Trooper Ennis arrived, Lt. Henry initiated his emergency lights and stopped behind the Suburban. Trooper Ennis stopped his vehicle behind Lt. Henry's.

After Lt. Henry pulled the Suburban over, Officer Hannan and the other DEA task force officers kept driving, got off at an exit, and gathered in a parking lot to wait for word about what happened at the traffic stop. They did not see or participate in the stop.

Lt. Henry and his partner walked to the Suburban, and Lt. Henry approached to speak to the driver, Telrone Houston. He told Houston that he stopped the Suburban for speeding. While standing at the window speaking with Houston, Lt. Henry smelled burnt marijuana inside the Suburban. He went to his

vehicle to get his citation book, and then walked back and asked Houston to step out of the Suburban.   He asked Houston about the marijuana odor, and Houston told him there was no marijuana in the car, but he had smoked marijuana earlier in the day.   Based on the odor and Houston's statement, Lt. Henry advised Houston that he was going to conduct a search of the vehicle.  He then had Lewis exit the vehicle as well.

Lt. Henry searched the Suburban and found the brown bag.  He unzipped it and observed five kilogram-sized packages of cocaine.  At that point, he told his partner and Trooper Ennis to detain Lewis and Houston.  As Lt. Henry was carrying the brown bag back to his patrol car, Lewis stated that the bag was his. Lt. Henry then searched the rest of the Suburban.  He did not find any marijuana, burnt or otherwise.

Over the course of the traffic stop, Lt. Henry called Officer Hannan three times to advise him of what had occurred.  Officer Hannan instructed Lt. Henry to arrest Lewis but to allow Houston to leave.  Lt. Henry arrested Lewis and advised him of his *Miranda*[3] rights.  Lewis agreed to provide a written statement claiming ownership of the contents of the bag.

Lt. Henry issued a traffic ticket to Houston for speeding and allowed him to leave the scene.   The ticket was later dismissed.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966).

## B. Lewis's Statements at the Jail

Before being transported to the Fulton County Jail, Lewis told Lt. Henry that he wanted to provide information about drug trafficking. Lt. Henry called Officer Hannan and relayed that Lewis wanted to talk. Officer Hannan and a second DEA task force officer, Matthew Dembowski, came to the jail to speak to Lewis. Officer Hannan introduced himself to Lewis as an FCSO officer. Officer Hannan then read Lewis his *Miranda* rights using a card that he borrowed from Officer Dembowski. Hannan borrowed the card because all of his own *Miranda* forms had "DEA" written on them, and he did not want Lewis to know that federal authorities were involved in the investigation.

After agreeing to waive his *Miranda* rights, Lewis stated that he was planning to transport the cocaine to Albany, Georgia, that he had done so before, and that the people in East Point had large quantities of methamphetamine.

## C. State Court Prosecution

On December 22, 2015, a Fulton County indictment charged Lewis with trafficking in cocaine. Lewis moved to suppress the cocaine and his subsequent statements. The state court denied his motion initially and on reconsideration. In testimony before the state court at a suppression hearing, Lt. Henry did not disclose the federal task force's role in his decision to stop the Suburban. Driver Houston testified that he did not tell Lt. Henry that he had smoked marijuana earlier in the day.

Lewis filed a second motion for reconsideration after receiving a DEA report revealing the task force's role in the investigation and arrest.  Looking at the evidence in light of the newly-uncovered DEA report, the state court granted Lewis's motion to suppress the cocaine and his statements.  The state court found that Lt. Henry did not smell marijuana and wanted an excuse to search the car, and that Houston was not speeding, stating as follows:

> [Lt. Henry] never smelled burning marijuana.  He simply wanted an excuse to search the car.  More specifically, he wanted to inspect the "brown bag" and its contents.
>
> . . .
>
> It thus appears that the traffic stop may well have been entirely pre-textual and that Houston was not speeding at the time he was pulled over.  Further, it clearly appears that [Lt. Henry] did not smell marijuana during his interview of [driver] Houston and hence the alleged reason for the search was simply not true.
>
> There was no probable cause to stop and search the vehicle and the detention of [driver] Houston and the [passenger] Defendant was unlawful.

The state did not appeal.  The state charges against Lewis were dismissed on November 1, 2017.

### D. Federal Prosecution Begins

After the state charges were dismissed, Officer Hannan consulted with the U.S. Attorney's Office about bringing federal charges against Lewis.    In February 2018, Officer Hannan contacted the FCSO's evidence custodian to have all five bricks of suspected cocaine tested, because only one of them was tested in advance of the state prosecution.  Officer Hannan also "instructed them that I needed the cocaine saved and preserved pending [these] possible federal charges against Mr. Lewis."

In September 2018, a federal grand jury indictment charged Lewis with one count of conspiracy to possess with intent to distribute, and one count of possession with intent to distribute, five kilograms of cocaine.

At no point after the federal indictment did Officer Hannan or anyone else working on the federal case follow up with the FCSO's evidence custodian to confirm that the cocaine was needed for a federal prosecution.  In the state case file, the evidence custodian never noted that the cocaine might be needed for a federal case.  In December 2019, Officer Hannan finally reached out to the FCSO because the drugs were needed for the federal trial.  At that point, he learned that the drugs had been destroyed, as a matter of routine, almost a year prior.

### E.  Denial of Motion to Suppress

Lewis moved the district court to suppress the cocaine and his statements.  Lewis argued, *inter alia*, that: (1) Lt. Henry was

not credible; (2) the stop and search of the Suburban were illegal; and (3) collateral estoppel should apply to bar relitigation of the legality of the stop because that issue was already decided in his state proceedings.

A magistrate judge held a hearing, at which Officer Hannan, Lt. Henry, and Trooper Ennis testified. The magistrate judge recommended that Lewis's motion to suppress be denied. Lewis objected to the R&R, and the district court ordered that another evidentiary hearing be held so that it could assess Lt. Henry's credibility for itself.

After that hearing, the district court denied Lewis's motion to suppress. It found that (1) Lt. Henry was credible; (2) there was probable cause for the traffic stop and the Suburban search; and (3) the cocaine and Lewis's statements were thus admissible. It further determined that, assuming collateral estoppel could apply in this context, its requirements were not met because there was no privity between the state and federal prosecuting authorities.

## II. Discussion: Collateral Estoppel and Lewis's Motion to Suppress

On appeal, Lewis argues that the district court erred in denying his motion to suppress. Lewis contends that the collateral estoppel doctrine precluded the federal government from relitigating the legality of the traffic stop and Lt. Henry's

subsequent search of the Suburban as that identical issue was already decided in state court.[4]

Collateral estoppel, otherwise known as issue preclusion, "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S. Ct. 1189, 1194 (1970). "Collateral estoppel . . . has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S. Ct. 645, 649 (1979).

This Court has indicated that it is an "open question" in this Circuit "[w]hether issue preclusion may apply in the criminal context to bar one governmental entity from relitigating a pretrial suppression order previously rendered against another governmental entity." *United States v. Perchitti*, 955 F.2d 674, 675 (11th Cir. 1992).[5]

---

[4] When reviewing a district court's denial of a motion to suppress, we review the court's findings of fact for clear error and its application of law to the facts *de novo*. *United States v. Campbell*, 26 F.4th 860, 870 (11th Cir. 2022) (en banc). In doing so, we view the evidence in the light most favorable to the government. *Id.* Our review may encompass the entire record. *United States v. Newsome*, 475 F.3d 1221, 1224 (11th Cir. 2007).

[5] In its brief, the government contends that the specific question identified in *Perchitti* has been settled and that federal courts cannot be bound by state

In *Perchitti*, the defendant was charged in Florida and, after the state court granted the defendant's motion to suppress, the state prosecutor dismissed the charges. *Id.* Subsequently, the defendant was indicted in federal court, and the Florida prosecutor was appointed as a "Special Assistant United States Attorney" for the federal prosecution. In federal court, the defendant's motion to suppress was denied. On appeal, the defendant argued that the federal court erred by not applying issue preclusion. *Id.*

This Court held that it was not necessary to "decide the applicability of issue preclusion to successive criminal prosecutions by multiple sovereigns, because there was no privity between Florida and the United States in [that] case." *Id.* at 676. Because issue preclusion applies only when the same issue has

---

criminal court decisions pertaining to motions to suppress. In support, it cites: (1) a footnote from a 2004 criminal forfeiture decision, *U.S. v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 n.1 (11th Cir. 2004), and (2) a Supreme Court case decided decades before *Perchitti*, *Elkins v. United States*, 364 U.S. 206, 80 S. Ct. 1437 (1960). However, neither case is anywhere near on point. Neither decision even mentions the phrase "collateral estoppel." In *One Piece of Real Property*, this Court reversed the district court's grant of summary judgment because there were disputed fact issues. And *Elkins*, a case that involved no federal agents at all, dealt with the question of whether federal courts should apply the exclusionary rule to the conduct of state agents even in states that had not yet adopted the exclusionary rule in their own courts. This brief walk through history has absolutely nothing to do with the issue here. The question we identified in *Perchitti* remains undecided.

been decided *against the same party*, a litigant seeking to invoke it against a third party must show some kind of privity between the original and current opposing parties. *See Montana v. United States*, 440 U.S. 147, 154, 99 S. Ct. 970, 974 (1979) ("[T]he persons for whose benefit and at whose direction a cause of action is litigated cannot be said to be strangers to the cause." (quotation marks omitted)).

In general terms, "privity" is a relationship between two parties who both have a legally recognized, mutual interest in the same subject matter. *See* Privity, *Black's Law Dictionary* (11th Ed. 2019). That relationship can take many different forms, some of which are easy to identify—e.g., a contractual relationship—while others are not so clear. In *Perchitti*, we described four factors relevant "in attempting to identify the nexus necessary between two parties to justify finding them in privity":

(1) "Privity may be found where a non-party substantially controls, or is represented by, a party to the action";

(2) "Another formulation requires that the party estopped must have been 'so closely related to the interest of the party to be fairly considered to have had his day in court'";

(3) "Still another derivative is that there must be a 'substantial identity' of the parties such that the party to the action was the virtual representative of the party estopped"; and

(4) "Furthermore, when the parties at issue are sovereigns, . . . a second prosecution may be barred where one prosecuting sovereign can be said to be acting as a 'tool' of the other, or

14                    Opinion of the Court                    20-12997

where the second prosecution amounts to a 'sham and cover' for the first."

Perchitti, 955 F.2d at 676 (footnotes and citations omitted).

After discussing these factors, this Court concluded that: (1) the state prosecutor's role in the federal prosecution was an insufficient basis for the application of issue preclusion against the United States; and (2) the investigatory cooperation between the Tampa police and the DEA (which the Court characterized as "minor involvement of DEA agents in the Tampa Police Department's investigation of the defendants") was not enough to establish privity. Id. at 677.

After review, we again conclude that it is not necessary to decide whether issue preclusion may apply in successive criminal prosecutions involving multiple sovereigns. Even assuming that it could apply if all of the elements were met, it would not apply here because Lewis has not established privity between the state and federal prosecuting authorities in this case.

We agree with Lewis that the cooperation between the state and federal governments in the investigation and arrest was far more than the "minor involvement of DEA agents" present in Perchitti. See id. And, while that cooperation is relevant in this case to the identity inquiry, we conclude it is not a sufficient nexus. The bulk of this cooperation occurred before either prosecution was initiated. No evidence has been presented showing federal prosecutors' involvement until after the state case was dismissed. Lewis has not shown that the state

prosecutors were acting as a "tool" of, or were even "substantially controlled" by, the federal prosecutors.  *See id.*

Lewis points us to the timeline of events, noting that he did not find out about the DEA's involvement until more than a year after the state-court prosecution began, after other co-conspirators had been indicted federally, and there was no need to hide the larger DEA investigation during his state prosecution.  But Lewis leaves the inference-drawing to us, inviting us to speculate that the federal prosecutors collaborated with the state prosecutors on a strategy to ensure the larger DEA investigation stayed "walled off."  We decline to do so.  Even if the DEA did not want to disclose its role and thereby stay walled off, this does not show the federal prosecutors were controlling the state prosecution itself.  There must be something more concrete, express, and extensive to support a finding that a party was a tool of, or was substantially controlled by, another party.

Because the federal and state governments were not in privity in this case, the federal government was not estopped from relitigating the legality of the traffic stop, the search, and Lewis's arrest.  Accordingly, we affirm the district court's denial of Lewis's motion to suppress.

## PART TWO: JURY SELECTION

### I.  Factual Background

We now move to the first day of trial, when the parties selected a jury from an initial pool of 38 prospects.

#### A.  For-cause dismissal of Juror 13

During voir dire, prospective Juror 13, who holds a masters degree in divinity, stated that she "struggle[d] with the spiritual aspect of grace," and agreed when asked if that meant she would "have difficulty standing in judgment of someone else." Lewis asked Juror 13 if that struggle was based on her religious convictions, and she said it was, as well as from personal experience.  Lewis then asked Juror 13 if she would be able to follow the judge's instructions and render her opinion based on the evidence in the case, and Juror 13 responded, "To the best of my ability, sir."

The district court followed up and asked Juror 13 if she believed she could be fair to both parties.  Juror 13 responded that given her moral beliefs she is not one to cast judgment and that it would be a struggle for her, stating:

> To be honest, Judge, I think morally I would struggle with that.  I do believe in that everlasting grace and forgiveness.  I know there's a law of the land, and also for my moral beliefs I don't think I'm the one to cast judgment on anyone.  So it would be a struggle for me, sir.

The government moved to strike Juror 13 for cause because she indicated that she did not believe she could be fair to both parties. Lewis objected because her hesitance had to do with her religious convictions and she said she would try to follow the instructions to the best of her ability.

The district court granted the government's motion to strike Juror 13 for cause. Responding to Lewis's argument, the court stated:

> But she had previously said that the best of her ability was impacted by her religious and moral considerations in passing judgment. I mean, that's like saying I can hit a curve ball to the best of my ability. I can assure you I could never hit a curve ball.
>
> …
>
> [W]hen I asked her a question, I deliberately left it open ended without trying to say can't you be fair or you can't be fair, can you. And in response to my questioning, as well as to yours . . . she hedged on her ability to be fair.

### B. Jurors 11 and 12

During voir dire, the parties asked the prospective jurors whether they would "tend to believe or disbelieve the sworn testimony of a police officer or a federal agent solely because of that person's position even before you heard his or her testimony?" Five jurors, including Jurors 11 and 12, indicated that

they were more likely to believe or disbelieve a law enforcement witness.

The government asked both Jurors 11 and 12 if they would be able to follow an instruction to treat an officer's testimony with equal weight. Both Jurors 11 and 12 responded yes. Lewis asked Juror 11 what caused his answer, and Juror 11 said, "I guess it's just my respect for law enforcement." Lewis asked Juror 11 if he believed he could be impartial, and Juror 11 said yes.

Juror 12 had stated that she had family who worked in government, including her husband's aunt who was a police officer. Lewis asked Juror 12 if she ever spoke to her husband's aunt about her work as a police officer, and Juror 12 said no. Lewis did not ask Juror 12 if she could be impartial.

Lewis moved to strike Juror 11 for cause based on his answer that he had more respect for law enforcement which made them more believable. He argued that Juror 11 could not be fair and impartial. The court asked if Lewis was also moving to strike Juror 12, because "she basically said the same thing." Lewis responded that he "didn't press her about that."

The district court stated that Jurors 11 and 12 both responded that they could follow an instruction to treat an officer's testimony with equal weight. The court pointed out that Juror 12 was a black female, while Juror 11 was a white male. Lewis stated he was moving on Juror 11 because Juror 11 said that law enforcement was more believable.

The court gave the parties the opportunity to follow up with Juror 11. The government asked Juror 11 if his respect for law enforcement would interfere with his ability to fairly evaluate the testimony of a law enforcement witness, and Juror 11 said no. Lewis asked if his respect for law enforcement was based on any interactions with or relationships with law enforcement, and Juror 11 said no. Juror 11 said he could follow an instruction not to give more weight to law enforcement than to anyone else.

After this questioning, Lewis did not renew his motion to strike Juror 11 for cause.

After all of the for-cause strikes were made, the court narrowed the prospective juror pool to the first 28 individuals. About one-third of the prospective jurors were black, while the other two-thirds were white. The government received six peremptory strikes, and Lewis received ten.

In exercising his ten peremptory strikes, Lewis struck eight white jurors, including Juror 11. The government raised a *Batson*[6] challenge to his strike of Juror 11, arguing that there was no difference between Jurors 11 and 12 other than their race.

The district court presumed a *prima facie* case was met and asked Lewis to explain why he struck Juror 11. Lewis stated that, although the government had attempted to rehabilitate Juror 11, that juror's original statement that he found law enforcement

---

[6] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986).

more believable because of his respect for law enforcement was still concerning.  Lewis noted that Juror 12 did not make a similar statement about respecting law enforcement, but he conceded that he did not ask her any questions about it.

The district court sustained the government's *Batson* challenge, finding that "the basis for which Juror No. 11 was struck had to do with the fact that he was Caucasian, when his answer that he gave was essentially identical to the juror literally right next to him, who was an African American female and gave the same answer."

The district court seated Juror 11 and pushed the last juror selected—a white woman—into the first alternate position.

## II.  Discussion

On appeal, Lewis argues that the district court (1) abused its discretion by striking Juror 13 for cause; and (2) erred in sustaining the government's *Batson* challenge and seating Juror 11 over Lewis's peremptory strike.  We first discuss Juror 13.

### A.  Juror 13

Lewis argues that the district court's for-cause strike of Juror 13 was an abuse of discretion in light of our holding in *United States v. Brown*, 996 F.3d 1171 (11th Cir. 2021) (en banc).[7]

---

[7] We review the district court's for-cause strike of a prospective juror for an abuse of discretion. *United States v. Pendergrass*, 995 F.3d 858, 871 (11th Cir. 2021).

In *Brown*, the district court dismissed an empaneled juror *during deliberations* after finding that the juror could not follow the district court's instructions due to his religious beliefs. *Brown*, 996 F.3d at 1181. At the outset of deliberations, the juror told the other jurors that "A Higher Being told [him]" that the defendant "was Not Guilty on all charges" and that he "trusted the Holy Ghost." *Id.* at 1177. After the other jurors raised concerns about these remarks, the district court interviewed the juror. *Id.* at 1178. The juror confirmed that he had prayed for and received divine guidance regarding the case, but assured the court he was following the jury instructions and basing his decision on the evidence and the law. *Id.* at 1179-80.

Applying the heightened standard required for dismissal of jurors *at the deliberation stage*, the en banc Court in *Brown* held that the district court's dismissal of the juror was an abuse of discretion. *See id.* at 1184-85, 1194 ("Our decision today follows directly from our and our sister circuits' precedents demanding satisfaction of the highest standard of proof to remove a juror from deliberations.").

The en banc Court explained that the improperly dismissed juror's statements "were nothing like those made by jurors in other cases where religious beliefs have disqualified jurors." *Id.* at 1189. Specifically, it maintained that "[c]ourts may exclude or remove jurors who make clear that they may not sit in judgment of others based on their religious beliefs." *Id.* at 1190. Unlike those types of cases, however, the juror in *Brown* "expressly

disavowed that any religious or moral beliefs were interfering with his ability to decide the case on the facts presented and on the law as instructed." *Id.* (cleaned up).

After review of *Brown* and the record, we conclude that the district court did not abuse its discretion in striking Juror 13 for cause during the voir dire stage of Lewis's case. Juror 13 stated that, per her moral beliefs, she was not one to sit in judgment of someone else and that would be a struggle for her. Juror 13 never confirmed that she felt capable of following the law and the court's instructions. This scenario is entirely distinguishable from the facts in *Brown*, where the court specifically asked the juror if his religious or moral beliefs were "interfering with [the juror's] ability to decide the case on the facts presented and on the law" as instructed, and the juror answered, "No, sir." *See id.* at 1178. Indeed, the dismissal of Juror 13 is just the type of dismissal that our en banc Court identified as allowable even though the dismissal was based on the prospective juror's religious beliefs. *See id.* at 1189-90.

Moreover, the heightened standard applicable to the dismissal of an already empaneled juror during deliberations was central to our decision in *Brown*. *Id.* at 1194. In contrast, "[w]e have recognized that there are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion than in ruling on challenges for cause in empaneling of a jury." *United States v. Davis*, 854 F.3d 1276, 1296 (11th Cir. 2017) (quotation marks omitted). We are not inclined to do so

here. The district court acted within its wide discretion in striking Juror 13 for cause.

## B. Jurors 11 and 12

Lewis next argues that the district court erred in sustaining the government's *Batson* challenge to his peremptory strike of Juror 11.[8]

The *Batson* three-step procedure for evaluating an objection to a peremptory challenge is as follows: (1) the objector must make a prima facie showing that the peremptory challenge was exercised on the basis of race; (2) the burden then shifts to the challenger to articulate a race-neutral explanation for striking the jurors in question; and (3) the trial court must determine whether the challenger's stated reasons were the actual reasons or instead were a pretext for discrimination. *Flowers v. Mississippi*, 588 U.S. __, 139 S. Ct. 2228, 2241 (2019). Disparate questioning of jurors can be probative of disparate intent. *Id.* at 2247.

After review, we conclude that the district court's finding of discriminatory intent in the peremptory strike of Juror 11 was not clearly erroneous. We defer to the district court's evaluation

---

[8] We review *de novo* jury selection under *Batson*, but we review the district court's underlying factual findings for clear error. *United States v. Campa*, 529 F.3d 980, 992 (11th Cir. 2008). Because the trial court is in the best position to evaluate the credibility and demeanor of the attorneys and jurors, our review of the trial court's factual determinations in the *Batson* context is "highly deferential." *See Snyder v. Louisiana*, 552 U.S. 472, 477-79, 128 S. Ct. 1203, 1208-09 (2008).

of the defense attorney's demeanor in explaining his rationale for the strike of Juror 11. *See Snyder*, 552 U.S. at 477-79, 128 S. Ct. at 1208-09. In addition, the attorney's disparate questioning of Jurors 11 and 12 about their tendency to believe law enforcement witnesses was probative of discriminatory intent. *See Flowers*, 588 U.S. \_\_, 139 S. Ct. at 2241. Thus, the court did not err in sustaining the government's *Batson* challenge and seating Juror 11.

In any event, we apply harmless error review "to any misapplication of *Batson* that results in the seating of a juror who is otherwise qualified for juror service." *United States v. Williams*, 731 F.3d 1222, 1236 (11th Cir. 2013); *see Rivera v. Illinois*, 556 U.S. 148, 158, 129 S. Ct. 1446, 1454 (2009).

Even if the district court had erred in its application of *Batson*, Lewis's substantial rights were not affected by the seating of Juror 11. Lewis does not contend that Juror 11 was not qualified to sit on the jury. *See Williams*, 731 F.3d at 1236; *Rivera*, 556 U.S. at 158, 129 S. Ct. at 1454. In fact, he declined to renew his for-cause challenge to Juror 11 when given the chance in the district court. Because Juror 11's qualifications are not in dispute, any *Batson* error was harmless.

## PART THREE: TRIAL

We now proceed to the trial itself.

## I.  Factual Background

### A. *Government's motion in limine*

Before trial, the government filed a motion *in limine* seeking to exclude from trial any reference to Lewis's state prosecution as irrelevant and unduly prejudicial under Fed. R. Evid. 401 and 403.

At a pretrial conference, the district court granted the government's motion in part but determined that the jury should be informed that (1) Lewis was prosecuted in state court and (2) the state case terminated before trial.  The district court ruled that those facts were relevant to explaining how the cocaine came to be destroyed prior to the federal trial.  The court stated that it would "give some thought" to "exactly what [it was] going to allow the jury to know" about the termination of the state case.  Lewis argued that the jury should be presented with "the totality of what transpired."

Following the pretrial conference, the government filed a supplemental memorandum reiterating its argument that any reference to the state prosecution should be excluded under Rules 401 and 403.  In response, Lewis argued that the balancing test in Rule 403 provided "ample reason to allow the jury to hear the totality of the case."

At trial, the district court returned to the issue of "what the jury is going to be told relative to the state prosecution."  It told Lewis that he could not ask questions about whether the traffic

stop was consistent with the Fourth Amendment, because that was already litigated in the federal pretrial proceedings. Next, the court stated that it would allow "the jury to know that the drugs no longer exist because the state case was terminated" and that the drugs accidentally were disposed of.

The district court, however, said it was "not going to go into why the state case was terminated." The court reasoned that "why the case was terminated is not relevant to the issues that the jury will have to decide in this case."

After the court ruled, Lewis did not make any further arguments on the issue.

## B. *Trial evidence*

In its case-in-chief against Lewis, the government called ten witnesses, including Officer Hannan, Lt. Henry, and Trooper Ennis. These three witnesses testified about the circumstances of Lewis's arrest, as described above. Specifically, Lt. Henry testified that Lewis claimed the brown bag belonged to him without any prompting and agreed to make a written statement to that effect.

And Officer Hannan testified that, at the police station, Lewis (1) admitted to having the cocaine in the car; (2) stated that he was transporting the cocaine to Albany, Georgia, to be distributed and had done so before; and (3) provided information about the methamphetamine-trafficking organization.

The government also called Warren Ferguson, a cooperating witness, who testified that he sold drugs to Lewis on

two occasions.  One transaction occurred on December 14, 2015, when Ferguson sold Lewis five kilograms of cocaine at the East Point residence.  Ferguson sold the cocaine to Lewis at a "wholesale price" of $32,000 per kilogram, and it was Ferguson's understanding that the drugs would sell for more than that on the street.

In addition, forensic chemist Karlie McManaman of the Georgia Bureau of Investigation testified that she tested all five packages of cocaine found in the brown bag—the first in 2016 at the state's request, and the other four in 2018 when the cocaine was resubmitted to the lab.  In total, the packages' contents weighed 5,016.35 grams, plus or minus 3.32 grams.  Each package contained cocaine that was between 65 to 85 percent pure.

The government introduced into evidence, among other documents, Lewis's written statement claiming responsibility for the brown bag found in the Suburban and photographs of the five packages of cocaine after they had been processed at the FCSO.

## C. Lewis's defense

In his cross-examination of Lt. Henry, Lewis questioned Lt. Henry about two prior inconsistent statements relating to the traffic stop.  The first inconsistent statement had to do with Lt. Henry's knowledge of when Trooper Ennis arrived at the scene, and the second had to do with his awareness of Trooper Ennis's dashboard camera.  The government did not object to any questions that Lewis asked based on the court's earlier exclusion

ruling about the reason why the case was terminated.  Notably, Lewis did not seek the court's permission to ask further questions or otherwise indicate that he considered the court's exclusion ruling to be preventing him from doing so.

In his closing argument, Lewis stressed the importance of the jury's role in determining the credibility of witnesses.  He contended that credibility was particularly significant to the government's case because (1) Trooper Ennis's dashboard video of the traffic stop did not have any audio that would corroborate Lt. Henry's account of what Lewis said on the side of the road; (2) there was no video or audio of Lewis's admissions to Officers Hannan and Dembowski at the jail; and (3) the cocaine was not placed into evidence due to its destruction.  Highlighting the two prior inconsistent statements from Lt. Henry, Lewis argued to the jury that Lt. Henry's testimony was not credible.  He asserted that Lt. Henry was "the central lynchpin of this entire case."

## D. Conviction and Sentence

The jury returned a verdict of guilty on both drug counts. The district court sentenced Lewis to 360 months' imprisonment on each count, to run concurrently.[9]

## II. Discussion

On appeal, Lewis argues that the district court's exclusion of any evidence relating to *why* the state court proceeding against

---

[9] In this appeal, Lewis does not raise any challenges to his sentences.

him was terminated—including the state court order finding that Lt. Henry was not credible—was an abuse of discretion under the Federal Rules of Evidence.  According to Lewis, if the jury knew Lt. Henry was found not credible by the state court, this would have undermined the entire case because Lt. Henry (1) was the arresting officer, (2) found the cocaine in the Suburban, and (3) testified that Lewis admitted the brown bag was his.

For the first time on appeal, Lewis argues that the exclusion violated his constitutional rights.  Specifically, Lewis contends the exclusion violated his Fifth Amendment right to present a defense and his Sixth Amendment right to effective cross-examination.  We take these arguments in turn.

### A.  *Lewis's Evidentiary Challenge*

Evidence is relevant if it has any tendency to make a material fact more or less probable than it would be without the evidence.  Fed. R. Evid. 401.  A district court, however, may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing of the issues, or misleading the jury.  *See* Fed. R. Evid. 403.[10]

---

[10] This Court reviews a district court's rulings on the admissibility of evidence for abuse of discretion.  *United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018).  Under abuse-of-discretion review, "this Court must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard."  *Id.* (quotation marks omitted).

Here, the district court did not conduct a balancing test under Rule 403. Rather, the district court excluded the evidence as not relevant under Rule 401 in the first place. We thus put aside whether any of the disputed evidence would have been excludable under Rule 403—a judgment we decline to make in the first instance.

The relevance issue under Rule 401 is not an easy one. The state prosecution was terminated because a state court determined that Lt. Henry was not credible and had not told the truth about the speeding or the smelling of marijuana. The state court based that determination on, among other things, Lt. Henry's omitting from his original testimony any mention of the DEA task force's involvement. By doing that, Lt. Henry omitted that the DEA task force had requested that Lt. Henry follow the Suburban, ascertain a traffic violation, and attempt to do a traffic stop. This was not some random traffic stop where Lt. Henry had happened upon a speeding vehicle, but one where Lt. Henry was directed by the DEA to follow a specific vehicle and attempt to find a traffic violation. Lewis asserts that this DEA background, or some portion of it, was arguably relevant to the issue of Lt. Henry's credibility about what had happened that day. In turn, Lt. Henry's credibility was itself an issue for the jury and bore on other jury issues too.

Ultimately, we need not decide the relevance issue because any error in excluding this evidence by the district court was harmless. Evidentiary errors are not grounds for reversal "unless

there is a reasonable likelihood that they affected the defendant's substantial rights." *United States v. Rutgerson*, 822 F.3d 1223, 1239 (11th Cir. 2016) (quotation marks omitted); *see* Fed. R. Crim. P. 52(a). "Overwhelming evidence of guilt is one factor that may be considered in finding harmless error." *United States v. Phaknikone*, 605 F.3d 1099, 1109 (11th Cir. 2010) (quotation marks omitted).

Even if this evidence would have led the jury to find Lt. Henry not credible and reject all his testimony, the government still presented overwhelming evidence of Lewis's guilt from other witnesses. The DEA video surveilling the East Point residence showed Lewis place the brown bag into the Suburban before getting into the passenger seat. Trooper Ennis testified that he assisted in the traffic stop of the Suburban and identified Lewis as one of the occupants of the Suburban. At the traffic stop, Trooper Ennis saw Lt. Henry remove the brown bag from the Suburban. Lewis has never challenged the authenticity of his handwritten statement taking responsibility for the contents of the brown bag that was in the Suburban.

Warren Ferguson testified that on that day he sold five kilograms of cocaine to Lewis at a "wholesale price," and expected that Lewis would be able to sell the cocaine for more on the street. The video showed Ferguson at the East Point residence, too. Officer Hannan testified that Lewis confessed at the jail that: (1) he had the cocaine in the Suburban, (2) he was transporting the cocaine to Albany, Georgia, to distribute there,

and (3) he had transported cocaine from Atlanta to Albany previously.    Finally, Chemist McManaman testified that the packages of cocaine weighed more than five kilograms in total.

Taking all of that together, the jury had more than enough evidence to convict Lewis for conspiracy to possess with intent to distribute, and possession with intent to distribute, five kilograms of cocaine—even if it did not believe Lt. Henry's testimony about Lewis volunteering himself as owner of the bag.    Accordingly, even if the district court erred, its error did not affect Lewis's substantial rights and is not grounds for reversal.

## B.  Lewis's Constitutional Challenges

Ordinarily, we review constitutional claims *de novo*.  *See United States v. Harris*, 916 F.3d 948, 954, 959 (11th Cir. 2019) (reviewing *de novo* defendant's claim that he was denied his right to present a complete defense); *United States v. Ignasiak*, 667 F.3d 1217, 1227 (11th Cir. 2012) (reviewing *de novo* a claim of denial of confrontation right).    But, because Lewis did not raise any constitutional objections below, we review these arguments for plain error.  *See United States v. Moriarty*, 429 F.3d 1012, 1018 (11th Cir. 2005).  To establish plain error, a defendant must show (1) error; (2) that is plain; (3) that affects his substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings.  *Id.* at 1019.

While a district court has discretionary authority to limit cross-examination, this discretion is limited by the Confrontation

Clause of the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; *United States v. Maxwell*, 579 F.3d 1282, 1295 (11th Cir. 2009). In particular, a presumption favors free cross-examination on possible bias, motive, ability to perceive and remember, and general character for truthfulness. *Maxwell*, 579 F.3d at 1295-96. "Cross-examination, after all, 'is the principal means by which the believability of a witness and the truth of his testimony are tested.'" *United States v. Mastin*, 972 F.3d 1230, 1239 (11th Cir. 2020) (quoting *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974)).

However, the district court retains wide latitude to impose reasonable limits on cross-examination based on, among other things, confusion of the issues. *Id.* at 1240. The Confrontation Clause is violated only if a reasonable jury would have received a significantly different impression of the witness's credibility had counsel pursued the proposed line of cross-examination. *Id.* at 1239-40.

Similarly, while the Constitution "guarantees criminal defendants a meaningful opportunity to present a complete defense," that right "is not absolute, and is subject to reasonable restrictions." *United States v. Mitrovic*, 890 F.3d 1217, 1221 (11th Cir. 2018). "[I]f the court permits a defendant to present the essence of his desired argument to the jury, his right to present a

complete defense has not been prejudiced." *Harris*, 916 F.3d at 959.

Here, as explained above, any error in excluding evidence relating to why the state court prosecution ended did not affect Lewis's substantial rights. Accordingly, he cannot establish plain error as to either of his constitutional challenges, and we need not discuss them further.

## CONCLUSION

For the reasons stated above, we affirm Lewis's convictions and sentences.

**AFFIRMED.**