[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-10179

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

TYVONNE WILEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:17-cr-00122-LMM-LTW-2

_____

Before JILL PRYOR and GRANT, Circuit Judges, and MAZE,* District Judge.

JILL PRYOR, Circuit Judge:

Tyvonne Wiley appeals his convictions for conspiracy to commit Hobbs Act robbery, Hobbs Act robbery, and brandishing a firearm during a crime of violence. He makes three arguments on appeal: (1) the district court abused its discretion by striking a juror for cause because of her religious beliefs, (2) the district court plainly erred by allowing law enforcement officers to identify Wiley in surveillance footage, and (3) his convictions for using, carrying, and brandishing a firearm during a crime of violence should be vacated because aiding and abetting Hobbs Act robbery is not a predicate crime of violence under 18 U.S.C. § 924(c). After careful consideration and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

Wiley was charged with one count of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); five counts of aiding and abetting Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951(a) and 2; and five counts of aiding and abetting to use, carry, and brandish a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. The indictment alleged that Wiley and codefendants Tevin Mitchell and Torey Starling

---

* The Honorable Corey L. Maze, United States District Judge for the Northern District of Alabama, sitting by designation.

had "aided and abetted" one another in committing a series of armed robberies several years earlier. Mitchell and Starling pled guilty, and Wiley proceeded to trial.

During voir dire, the court asked the jury pool if anyone "would not accept or follow the law given by the judge at the end of the trial," and if anyone "ha[d] any moral or religious convictions which discourage or prevent jury service or would make it difficult for [them] to pass judgment." Doc. 329 at 27.[1] Prospective Juror 23 told the court that she was a Jehovah's Witness and would have difficulty judging others because she did not "have a lot of faith in the legal—the justice system." *Id.* at 27–28. The court and counsel for both parties questioned Juror 23 on her ability to be impartial. In response to the questioning, she expressed her opinion that nobody knew the truth about what happened except the people involved and Jehovah. She said that she did "not want to be responsible for someone going to jail when [she] won't be given all of the facts according to the way justly they should be given to [her]" and would instead have to rely on "imperfect men's opinions." *Id.* at 149–50.

When the government asked Juror 23 if she could be impartial, she responded, "I don't really know. I cannot tell you that I would." *Id.* at 150. When defense counsel asked her if she could give each side a fair trial, she stated that "fair is relative." *Id.* at 151. The court acknowledged that some aspects of Juror 23's religion

---

[1] "Doc." numbers refer to the district court's docket entries.

may "make[] it difficult for a person to potentially sit in judgment over another person" and asked her to explain whether that was true for her. *Id.* at 151–52. She responded that God was the only judge and she could not judge people.

After this exchange, the government moved to strike Juror 23 for cause because she did not answer clearly when asked whether she could be fair and impartial, emphasized that she would not have all the facts of the case, and said she could not judge other people. Defense counsel opposed the strike, arguing that Juror 23's statements did not mean that she could not be impartial, merely that it would be difficult for her. The court agreed with the government and struck Juror 23 for cause. The court explained that it had "some concerns about her ability to follow the court's instructions about this being the evidence and follow what it is she's supposed to do." *Id.* at 153.

At trial, the government introduced evidence of Wiley's role in the series of armed robberies, which occurred at several retail stores. One of the government's witnesses was Sergeant Darren Hull, a Cobb County police officer who investigated the robberies. Hull explained that as part of the investigation, he and other officers surveilled a house associated with the robberies. The house belonged to Wiley's codefendant, Torey Starling. During Hull's testimony, the government played a surveillance video taken at Starling's house the day after one of the robberies. The video showed a man sitting on the porch of the house holding a cell phone and removing a stack of cash from his pocket. The government also

introduced still images from the surveillance video. Hull identified the man in the images as Wiley. Although Hull was unfamiliar with Wiley at the time the footage was captured, he testified, "at the conclusion of the investigation[,] that is who I learned was Mr. Wiley." Doc. 330 at 224. Hull also identified Wiley in the courtroom after Wiley removed his face covering.

Hull also testified that the day after the surveillance footage was taken, officers executed a search warrant at Starling's house. When Hull arrived with other officers to execute the search warrant, he saw a man run out of the house. Hull and another officer pursued the man. They eventually stopped him and placed him in handcuffs. The man turned out to be Wiley.

Defense counsel did not object to Hull's testimony identifying Wiley as the man in the photograph or to the introduction of the still images. On cross examination, defense counsel questioned Hull about the "close-up picture of Mr. Wiley sitting on the porch" and acknowledged that the government showed a "picture . . . of Mr. Wiley sitting on the porch." *Id*. at 242, 247.

The government also called former Cobb County detective David Raissi, another law enforcement officer who investigated the robberies. Like Hull, Raissi was present when Wiley was arrested. During his testimony, Raissi identified Wiley as the person in the surveillance photographs who was sitting on the porch holding a stack of money. Defense counsel did not object to this testimony. Raissi also testified that he interacted with Wiley immediately following his arrest, and he identified the clothes that Wiley was

wearing at the time. Raissi photographed Wiley after his arrest. When the government showed him the photographs he had taken of Wiley, Raissi identified Wiley in the photographs, noting that Wiley had a tattoo under his left eye, a ninja turtle tattoo on the side of his right eye, and a tattoo of a dollar sign on his forehead.

The government also called Starling. Starling testified that he met Wiley approximately two months before the men were arrested. Starling admitted that he participated in two of the robberies. He testified that on each occasion he drove Wiley and Mitchell to a retail store. Once they arrived at the retail stores, Wiley, carrying a mask and a gun, exited the car and robbed the stores. Starling admitted that Wiley paid him for driving to the stores.

The government showed Starling the same surveillance video it had shown to Hull. Starling identified the man in the video as Wiley and noted that Wiley was holding a stack of money. He also identified Wiley in the courtroom.

During their investigation, officers searched Starling's house and car. The government introduced into evidence two masks that had been recovered from Starling's house and a gun that had been recovered from his car. Starling testified that Wiley used these items during the robberies. In addition to Starling's testimony, the government introduced evidence showing that Wiley's fingerprints and DNA were found on the masks recovered from Starling's house and that his DNA was found on the gun recovered from Starling's car.

The jury found Wiley guilty on all counts. After trial, Wiley invoked Federal Rule of Criminal Procedure 29 in a motion to dismiss three of the § 924(c) counts of conviction, arguing that aiding and abetting Hobbs Act robbery was not a crime of violence. The district court denied Wiley's motion, concluding that his argument was foreclosed by this Court's precedent. This is Wiley's appeal.

## II.    STANDARD OF REVIEW

We review a district court's decision to strike a juror for cause for an abuse of discretion. *United States v. Brown*, 996 F.3d 1171, 1182 (11th Cir. 2021) (en banc). "We will reverse the district court only if we find that it discharged the juror without factual support, or for a legally irrelevant reason." *Id*. (internal quotation marks omitted).

We generally review for abuse of discretion a district court's decision to admit lay opinion testimony. *See United States v. Pierce*, 136 F.3d 770, 773 (11th Cir. 1998). Where a party fails to object to the testimony at trial, however, we review for plain error. *See United States v. Campo*, 840 F.3d 1249, 1265 (11th Cir. 2016).

Whether an offense is a crime of violence under 18 U.S.C. § 924(c) is a question of law that we review *de novo*. *Alvarado-Linares v. United States*, 44 F.4th 1334, 1341 (11th Cir. 2022).

## III.    DISCUSSION

Wiley makes three arguments on appeal. First, he argues that the district court abused its discretion by striking Juror 23 based on her statements regarding her religious beliefs and her

ability to render a fair and impartial verdict. Second, he argues that the district court erred by allowing law enforcement officers to give lay opinion testimony identifying Wiley in the surveillance footage presented at trial when the officers did not become familiar with Wiley until after his arrest. Third, he argues that his § 924(c) convictions should be vacated because aiding and abetting Hobbs Act robbery no longer qualifies as a crime of violence under § 924(c). We reject Wiley's arguments and affirm the district court's judgment.

### A. The District Court Did Not Abuse Its Discretion by Striking Juror 23 for Cause.

Wiley argues that the district court abused its discretion by excusing prospective Juror 23. He contends that, although Juror 23 questioned the fairness of the judicial process and explained that it would be difficult for her to judge others, she did not indicate that she was unable to weigh the evidence, follow the law, and render a just verdict. We disagree. Juror 23 said that her religious convictions might impact her ability to sit on a jury and that she did not know if she could be impartial. The district court therefore did not abuse its considerable discretion when it struck Juror 23 for cause.

"Courts may exclude or remove jurors who make clear that they may not sit in judgment of others based on their religious beliefs." *Brown*, 996 F.3d at 1190. In *Brown*, the district court removed a deliberating juror after he told other jurors that "the Holy Spirit told him [the defendant] was not guilty on all charges." *Id.* at 1193 (internal quotation marks omitted). We reversed, reasoning that,

when the district court questioned the juror about his statements after the issue came to light, the juror "expressly disavowed that any religious or moral beliefs were interfering with his ability to decide the case on the facts presented and on the law as instructed." *Id.* at 1190 (alterations adopted) (internal quotation marks omitted). We noted that the juror never "express[ed] any lack of faith in the justice system or admit[ted] that he could not be fair." *Id.* at 1187.

Here, unlike the juror in *Brown*, Juror 23 could not confirm her ability to be fair and follow the court's instructions on weighing the evidence presented. *See United States v. Lewis*, 40 F.4th 1229, 1241–42 (11th Cir. 2022) (holding that the district court did not abuse its discretion when it struck a juror who could not confirm her ability to be fair and stated during jury selection that she was not one to cast judgment on others and that it would be a struggle for her to do so). When asked whether she could be impartial, Juror 23 responded that she did not know. She explained that, based on her religious beliefs, she could not judge other people. She expressed doubt that she would be given all the facts she thought she should be given to decide the case, saying that she "could only be as fair as what you give me." Doc. 329 at 150–51. She voiced concern about relying on "imperfect men's opinions" without all the facts. *Id.* at 149–50. And she said that she did not "have a lot of faith in the . . . justice system." *Id.* at 27–28. Based on these responses, the district court did not abuse its discretion in striking Juror 23 for cause. *See Lewis*, 40 F.4th at 1241–42.

We note that this case is further distinguishable from *Brown* because in *Brown* "the heightened standard applicable to the dismissal of an already empaneled juror during deliberations was central to our decision." *Id.* at 1242. Here, by contrast, Juror 23 was struck during jury selection. And "there are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion than in ruling on challenges for cause in empaneling of a jury." *Id.* (internal quotation marks omitted).

## B. The District Court Did Not Plainly Err by Permitting Law Enforcement Officers to Offer Lay Opinion Testimony.

Next, Wiley argues that the district court plainly erred by permitting law enforcement officers to identify him in surveillance videos and photographs because the officers lacked sufficient familiarity with him to permit their identification testimony. He also argues that the officers should not have been permitted to testify that he was holding a stack of money because they had no way of identifying the object in his hand, other than by examining the photographs. Wiley failed to object to the officers' testimony at trial, so we review this argument for plain error. *See Campo*, 840 F.3d at 1265. "To prevail under plain error review, [the defendant] must show that the district court made an error, that the error was plain, and that it affected his substantial rights." *United States v. Iriele*, 977 F.3d 1155, 1177 (11th Cir. 2020). And we will not reverse based on plain error unless the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Id.* Even

assuming the admission of the officers' identification testimony was erroneous, Wiley has not shown that the error affected his substantial rights.

Federal Rule of Evidence 701 provides that a lay witness's "testimony in the form of an opinion" must be "(a) rationally based on the witness's perception, (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. We have explained that "lay opinion identification testimony may be helpful to the jury where . . . there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *Pierce*, 136 F.3d at 774 (internal quotation marks omitted). "Perhaps [the] most critical [factor] to this determination is the witness's level of familiarity with the defendant's appearance." *Id.* On one end of the spectrum, "familiarity derived from a witness's close relationship to, or substantial and sustained contact with, the defendant weighs heavily in favor of admitting the witness's identification testimony." *Id.* On the other end, "knowledge of the defendant's appearance based entirely on the witness's review of photographs . . . is not based on anything more than the evidence the jury would have before it at trial." *Id.* (internal quotation marks omitted). Other considerations include "the witness's familiarity with the defendant's appearance at the time the surveillance photographs were taken." *Id.*

Here, the officers' familiarity with Wiley lands somewhere in the middle. Although it falls short of the "close relationship . . . or substantial and sustained contact" contemplated in *Pierce*, both officers were present when Wiley was arrested just a day after the surveillance footage was captured and thus had more familiarity with Wiley's appearance at that time than the jury. *See id.* But we need not decide whether the officers' post-arrest familiarity with Wiley was sufficient to permit them to identify him at trial. Assuming that the district court erred by admitting the lay opinion identification testimony, Wiley cannot show that his substantial rights were affected. "A substantial right is affected if the appealing party can show that there is a reasonable probability that there would have been a different result had there been no error." *United States v. Bennett*, 472 F.3d 825, 831–32 (11th Cir. 2006). Wiley cannot make this showing because the officers' identification testimony was not the only evidence linking Wiley to the robberies.

For one thing, Wiley's codefendant Starling—who knew Wiley personally and spent considerable time with him in the two months preceding the surveillance footage and Wiley's arrest— confirmed that Wiley was at Starling's house on the day the surveillance footage was taken. Starling identified Wiley as the man in the video. He also noted that Wiley was holding a cell phone in the video and took money out of his pocket. On appeal, Wiley does not challenge the admission of this testimony. Additionally, defense counsel acknowledged at trial that Wiley was the person in the video.

For another, the government presented additional evidence linking Wiley to the robberies. Starling testified that Wiley paid him to drive Wiley to two retail stores, where Wiley, carrying a gun and a mask, got out of the car to rob the stores. When police recovered two masks from Starling's house and a gun from Starling's car, Starling identified them as the items Wiley used during the robberies. Wiley's fingerprints and DNA were found on the masks, and his DNA was found on the gun recovered from Starling's car. Considering Starling's testimony identifying Wiley in the surveillance footage and the substantial evidence establishing Wiley's involvement in the robberies, Wiley cannot show that the admission of Hull's and Raissi's testimony affected his substantial rights.

### C. Our Precedent Forecloses Wiley's Argument that Aiding and Abetting Hobbs Act Robbery Is Not a Crime of Violence.

Finally, Wiley argues that his § 924(c) convictions for brandishing a firearm during a crime of violence should be vacated because aiding and abetting a completed Hobbs Act robbery is not a predicate crime of violence. He acknowledges our precedent to the contrary but argues that our prior decision has been abrogated by the Supreme Court's decision in *United States v. Taylor*, 142 S. Ct. 2015 (2022). We reject Wiley's argument.

Section 924(c) punishes "any person who, during and in relation to any crime of violence . . . , uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm."

18 U.S.C. § 924(c)(1)(A). To qualify as a "crime of violence" under § 924(c), a felony must have "as an element the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* § 924(c)(3)(A). This language is known as the "elements clause" of § 924(c).

Wiley was convicted of five counts of aiding and abetting Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951(a) and 2. Specifically, the indictment charged for each of these counts that Wiley and others, "aided and abetted by one another, did obstruct, delay[,] and affect commerce by robbery . . . by knowingly and unlawfully taking property . . . belonging to [a business] . . . in the presence of an employee of the business, by means of actual and threatened force, violence[,] and fear of injury to the person of the employee." Doc. 189 at 3. These substantive counts for aiding and abetting Hobbs Act robbery served as the predicate offenses for Wiley's § 924(c) convictions for brandishing a firearm during a crime of violence.

Under our precedent, aiding and abetting a completed Hobbs Act robbery constitutes a crime of violence. *See In re Colon*, 826 F.3d 1301, 1305 (11th Cir. 2016). In *Colon*, we relied on our precedent establishing that completed Hobbs Act robbery qualifies as crime of violence under § 924(c)(3)(A). *See id.* (citing *In re Saint Fleur*, 824 F.3d 1337, 1341 (11th Cir. 2016)). Hobbs Act robbery criminalizes the "unlawful taking or obtaining of personal property from the person . . . of another, against his will, by means of actual or threatened force, or violence, or fear of injury." 18 U.S.C.

§ 1951(b)(1)). Thus, the elements of Hobbs Act robbery "require the use, attempted use, or threatened use of physical force 'against the person or property of another.'" *Saint Fleur*, 824 F.3d at 1341 (quoting 18 U.S.C. § 924(c)(3)(A)).

*Colon* explained that "[a]iding and abetting, under 18 U.S.C. § 2, is not a separate federal crime, but rather an alternative charge that permits one to be found guilty as a principal." 826 F.3d at 1305 (internal quotation marks omitted). "Because an aider and abettor is responsible for the acts of the principal as a matter of law, an aider and abettor of a Hobbs Act robbery necessarily commits all the elements of a principal Hobbs Act robbery." *Id.* Because Hobbs Act robbery itself qualifies as a crime of violence under § 924(c)'s elements clause, so does aiding and abetting Hobbs Act robbery. *Id.*

Wiley acknowledges that his argument is foreclosed by our precedent, but he urges us to revisit the issue in light of the Supreme Court's decision in *Taylor*. *See* 142 S. Ct. at 2025–26 (holding that attempted Hobbs Act robbery is not a crime of violence under 18 U.S.C. § 924(c)). To disturb our existing precedent, a "Supreme Court decision must be clearly on point" and "actually abrogate or directly conflict with, as opposed to merely weaken, the holding of the prior panel." *United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009) (internal quotation marks omitted). Because the Supreme Court's analysis in *Taylor* was limited to attempted Hobbs Act robbery, Wiley cannot overcome our established precedent holding

that aiding and abetting completed Hobbs Act robbery is a crime of violence under § 924(c)(3)(A).

In *Taylor*, the Supreme Court held that attempted Hobbs Act is not a crime of violence under § 924(c)(3)(A). 142 S. Ct. at 2025. The Court distinguished between the *completed* offense—which requires the government to prove the use, attempted use, or threatened use of force—and an *attempt* to complete that offense. To obtain a conviction for completed Hobbs Act robbery, the government must prove "that the defendant engaged in the 'unlawful taking or obtaining of personal property from the person of another, against his will, by means of actual or threatened force.'" *Id.* at 2020 (alteration adopted) (quoting 18 U.S.C. § 1951(b)). By contrast, to obtain a conviction for attempted Hobbs Act robbery, the government need only show that the defendant intended to complete the offense and performed a "substantial step" toward that end. *Id.* (internal quotation marks omitted). "And whatever a substantial step requires," the Court said, "it does not require the government to prove that the defendant used, attempted to use, or even threatened to use force against another person or his property." *Id.*

The same reasoning does not apply to accessory liability under 18 U.S.C. § 2, which is distinct from attempt and other inchoate offenses. Section 2 provides that:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2. Unlike attempt, aiding and abetting under § 2 "is not a separate federal crime, but rather an alternative charge that permits one to be found guilty as a principal." *United States v. Sosa*, 777 F.3d 1279, 1292 (11th Cir. 2015) (internal quotation marks omitted). To obtain a conviction for aiding and abetting, the government must prove, among other things, that someone committed the substantive offense. *Id.* By contrast, "*Taylor* hinged on the fact that attempt is a separate crime from the underlying offense, with the distinct element of a 'substantial step.'" *United States v. Worthen*, 60 F.4th 1066, 1070 (7th Cir. 2023) (internal quotation marks omitted); *see also United States v. Draven*, No. 21-7171, --- F.4th ---, 2023 WL 5112021 at *9 (4th Cir. Aug. 11, 2023) (rejecting an argument similar to Wiley's and explaining that "the Supreme Court did not explicitly instruct on *Taylor*'s reach beyond the purview of *attempted* Hobbs Act robbery" (emphasis in original)); *United States v. Stevens*, 70 F.4th 653, 662 (3d Cir. 2023) (considering the same issue after *Taylor* and holding that, "because the force required for completed Hobbs Act robbery is sufficient to satisfy the elements clause, the force required for an aiding and abetting conviction is necessarily also sufficient" (citation omitted)).

Whereas attempt to commit Hobbs Act robbery can be proven by showing intent and a substantial step, "an aider and abettor of a Hobbs Act robbery necessarily commits all the elements of

a principal Hobbs Act robbery." *See Colon*, 826 F.3d at 1305. The Supreme Court's decision in *Taylor* therefore did not "actually abrogate or directly conflict with" our holding regarding accessory liability under § 2. *See Kaley*, 579 F.3d at 1255. And because *Taylor* did not disturb our holding that completed Hobbs Act robbery is a crime of violence, aiding and abetting a completed Hobbs Act robbery also qualifies as a crime of violence under § 924(c)(3)(A). *See Taylor*, 142 S. Ct. at 2020 ("Whatever one might say about *completed* Hobbs Act robbery, *attempted* Hobbs Act robbery does not satisfy the elements clause." (emphasis in original)).

## IV.    CONCLUSION

For the above reasons, we affirm Wiley's convictions.

**AFFIRMED.**