[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11543

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

WILLIAM GROSS, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20532-PCH-1

_____

Before ROSENBAUM, NEWSOM, and LUCK, Circuit Judges.

PER CURIAM:

Appellant William Gross, Jr., was charged with (and later convicted of) seven counts of distribution of child pornography. Although the district court appointed counsel for Gross, Gross filed pro se documents and sought to discharge his counsel. The district court held two hearings to assess Gross's intent. It found that, by his actions and words, Gross knowingly and voluntarily waived his right to counsel and would proceed pro se. Still, though, the court ordered counsel to be on standby to assist Gross. Gross went to trial and was convicted on all counts.

He now asserts that the district court violated his Sixth Amendment right to counsel because the court required him to proceed pro se. Besides that, Gross raises several claims that he did not receive a fair trial and the district court otherwise violated his constitutional rights. After careful review of the record and with the benefit of oral argument, we find no merit to any of Gross's arguments and affirm his convictions.

## I.    BACKGROUND

A.    Pretrial Proceedings

In October of 2021, Gross was arrested, and a grand jury charged him with seven counts of distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2). Each of the seven counts corresponded with a date between August and November 2020 on which Gross shared an image or video of child pornography with an undercover agent from the Federal Bureau of Investigation.

Gross made his initial appearance on October 5, 2021. At that time, the magistrate judge informed Gross of the charges against him, found him to be indigent, and appointed counsel to represent him.

About two months later, Gross began filing various pro se documents about his legal representation. In one filing he entitled "Notice Nolle Prosequi," Gross stated that he was proceeding in "propria persona."[1] Gross attached a "Judicial Affidavit of Nolle Prosequi" to this filing. In that affidavit, Gross said he was "the living human being William Gross, Jr., authorize[d] representative for fictitious business name William Gross Jr. on paper." Besides that, Gross challenged the district court's jurisdiction and lodged a continuing objection to his counsel of record, Assistant Federal Public Defender Lauren F. Krasnoff.

In other filings on the same date—such as his filings he called "Rescission of Signature"; "Notice of Unlawfully Forced, Abuse of Public Office and Abuse of Power"; and "Notice [of] Continuing Objection to All Attorney Types"—Gross reiterated these same sentiments. Again, in one of these filings, Gross insisted he was proceeding "in propria persona" and indicated that he was making a "continuing objection to all attorney types appointed including pro-se, Lauren F. Krasnoff, Private attorney, Federal Public

---

[1] "In propria persona" means "without the assistance of an attorney." *See* https://www.merriam-webster.com/dictionary/in%20propria%20persona (last visited January 24, 2024).

Defender Officer, or any other attorney types appointed in this legal matter."

The next day, Krasnoff moved for a status conference to address Gross's remarks about his legal representation. By way of explanation for her motion, Krasnoff noted that Gross's recent filings included a request that she no longer represent Gross. The motion also recounted that during a legal visit, Gross asked a prison guard to inform Krasnoff that he no longer wanted her legal representation. Then Gross left the visitation room and refused to speak with Krasnoff.

### 1. Status Conference

On January 6, 2022, the district court held a telephonic status conference, during which Krasnoff voiced concerns about Gross's filings and the fact that he would not speak with her. The district court observed that Gross had filed several notices that "don't make a lot of sense," so he asked Gross to explain his concerns.

Gross responded to the judge (Judge Huck), "Mr. Huck, I do object to this conference call. I do also object to any attorney-type proceedings." And he said, "I object to my attorney in this case." The district court asked if Gross wished to represent himself in the case, and Gross responded, "I am proceeding in propria persona." In response, the court explained that it understood Gross to mean that he wanted to discharge Krasnoff and asked if Gross had another lawyer to represent him. Gross responded that he did not. And the court asked, "So you want to proceed on your own, representing yourself; is that the case?" Gross replied, "I am

representing myself in propria persona. I am objecting to pro se and any private attorneys or public defenders or officers of the court."

The district court repeatedly inquired, "What does that mean?" Then, a third time, the court asked Gross whether he wanted to "discharge Ms. Krasnoff as your lawyer, and . . . represent[] yourself without a lawyer." This time, Gross responded, "I am objecting to all attorney types, and I am proceeding in propria persona."

The court tried yet again, explaining that unless Gross said otherwise, it understood Gross wanted to represent himself. Gross persisted, repeating, "I am here in propria persona." When the court again asked what Gross meant, Gross said, "I am here. I am a living human being. I am here for the fictitious name on paper." The court expressed its belief that Gross was "play[ing] games with the Court" and indicated that it would allow Gross to represent himself and Krasnoff would serve as back-up counsel to advise him.[2]

---

[2] Gross's language was consistent with that of proponents of the "sovereign citizen" argument. Indeed, Gross conceded his sovereign-citizen stance throughout the proceedings. In *United States v. Williams*, we explained that sovereign-citizen proponents "challenge the jurisdiction of district courts to try criminal cases by asserting that the federal government has no authority over [them]." 29 F.4th 1306, 1308 (11th Cir. 2022). Sovereign citizen proponents are often disruptive and deny that they are the defendants in actions against them. *United States. v. Sterling*, 738 F.3d 228, 233 n.1 (11th Cir. 2013). They also often refer to themselves as third-party intervenors. *Id.* And they

6                     Opinion of the Court                    22-11543

Then, the district court moved on and advised Gross that if he did not wish to plead guilty, trial would begin on February 14th. Once again, though, Gross said, "I understand, but I am objecting to filing as pro se. . . . I'm not agreeing to going into this court with pro se."

Yet again, the court tried to confirm with Gross what he wanted. So the court asked, "Do you want to proceed with or without counsel? Tell me yes you want to proceed with counsel, or no you don't want to proceed with counsel. Which is it?" Gross replied, "No, I'm objecting to all counsel, to all attorney types."

Given that answer, the court reiterated that trial would proceed on February 14th, Gross would represent himself at trial, and Krasnoff would serve as standby counsel, "available for consultation and to answer any questions you may have about the proceedings."

The government questioned Gross in an effort to confirm that his waiver of his right to counsel was knowing and voluntary. Gross confirmed he was not under the influence of any medication and had never taken any sort of psychiatric medication or seen a

---

have been known to use unusual phrases like the ones Gross used in this case. *See id.; Cantu v. City of Dothan*, 974 F.3d 1217, 1223 (11th Cir. 2020) (defendant declared himself to be "Flesh and blood of living Man"). The FBI has provided a description of the sovereign citizen ideology. *See Williams*, 29 F.4th at 1308 (citing Federal Bureau of Investigation, "Sovereign Citizens: An Introduction for Law Enforcement" 3 (Nov. 2010), https://info.publicintelligence.net/FBI-SovereignCitizens.pdf)).

psychiatric official for mental-health issues. He also said that no medication, drugs, alcohol, or mental-health concerns affected his ability to understand the proceedings. When asked if he was waiving his right to counsel knowingly and voluntarily, Gross, responded, "Yes. I'm objecting to all attorney types."

The hearing concluded with the court explaining, "[Y]ou're pretty much on your own now, but you have access to [Krasnoff's] help and assistance if you so choose to seek that. I would recommend that you do seek that, because [Krasnoff is] a very good lawyer, and she can help you with regard to your defense, but that's your choice. You have the right to represent yourself, and I'm going to acknowledge that right and allow you to proceed."

The next day, the court issued a written order granting defense counsel's oral motion to withdraw as counsel. In the Order, the court concluded that Gross "knowingly and voluntarily waived his right to counsel and is competent to do so."

### 2. *Faretta* Hearing

Gross continued to file various documents in which he voiced his intent to proceed in propria persona and his objection to the federal public defender and "any other attorney types appointed in this legal matter." In the meantime, the government sought for the district court to conduct an inquiry pursuant to *Faretta v. California*, 422 U.S. 806 (1975), to establish that Gross understood the risks of representing himself and that he freely made that choice.

Based on this request, the district court held another hearing on January 18, 2022, nearly a month before trial was scheduled to start. At the beginning of the hearing, the court noted that Gross had previously indicated that he wanted to proceed as his own lawyer. When the court asked, "do you still want to proceed on your own?" Gross responded, "Objection. I'm not here to proceed on my own. I am here to object to all attorney types."

The court questioned Gross about his background. Gross said that he had a twelfth-grade education, did not suffer from any mental illness, and had not consumed any drugs or alcohol in the prior 24 hours. He also reported that his occupation was in retail business. When asked whether he had ever studied law, Gross said he had not, but he mentioned he picked up some informal training in the law at the Bureau of Prisons. Although Gross noted that he had never been involved in a prior criminal proceeding, he said he understood the nature of the charges brought against him, his possible defense, and the fact that, if convicted, he was facing a mandatory minimum sentence of five years and up to a maximum of twenty years as to each of the counts.

Gross also assented that he understood he would be doing all of the legal work. Even so, though, he remarked, "but I am not proceeding as pro se." In response, the court again explained that Krasnoff would serve as standby counsel, which meant "if [Gross] had some questions that [he] would want to discuss with her, get some advice from her . . . that she would be available for that."

As for the Federal Rules of Evidence and federal criminal procedure, Gross said he was familiar with them and understood the proceedings.  Gross also commented that he did not give consent for a magistrate judge to preside over the case.

Then the court turned to Gross's refusal to meet with Krasnoff in prison.  Again, the court noted that Krasnoff was an experienced lawyer who would be able to investigate, prepare motions and filings, and represent Gross at trial.  Gross responded that he understood if he represented himself, Krasnoff would not be his full-time lawyer, but rather only a standby lawyer, and he would be at a disadvantage.

After this colloquy, the court recognized that Gross had indicated both in a prior telephonic hearing and "now today in person" that he wished to represent himself.  Yet Gross responded, "Mr. Huck, I'm not representing myself.  I'm representing myself as propria persona."  The court replied, "[B]ut that decision was made by you, not someone else, right?"  Gross stated, "It is correct.  I represent myself in propria persona for the fictitious business name that is on the indictment[.]"  Gross agreed no one had threatened him or forced him to come into court and say he wanted to represent himself.  Based on these interactions, the court found that Gross knowingly and voluntarily waived his right to counsel.

As a final matter, Gross asked the judge what kind of officer of the court he was and whether he was a magistrate judge.  The judge answered that he was a district-court judge.  And Gross responded that he "d[id] not recognize [the judge] as an Article III

judicial judge." Once again, the court concluded that Gross was knowingly and voluntarily waiving his right to counsel, and that he would proceed on his own, with the assistance of standby counsel.

The district court entered an Order granting Gross's request to continue representing himself. On the same day, Gross filed yet another notice, in which he stated that he intended to "proceed in propria persona throughout the case." Gross continued to file pro se pleadings challenging the court's authority.

### 3. Calendar Call

A week and a half before trial, court held a calendar call in the case. At that proceeding, the government noted that Gross had still been refusing to communicate with or meet with standby counsel. The court responded by asking Gross whether he wanted a different lawyer appointed. Although Gross opined that standby counsel was ineffective, he also insisted he did not consent to the assignment of a new lawyer to his case. Instead, Gross remarked that, at trial, he would make an opening statement and cross-examine witnesses. Upon hearing this, the court advised Gross that he had the right to remain silent and not testify. The court also recommended that Gross speak to standby counsel about the issue of whether he should testify.

B.    Trial

### 1.    Jury Selection and Opening Statements

On February 14, 2022, the district court began jury selection. Krasnoff was present as Gross's standby counsel and made notes recommending potential jurors to challenge for cause, but Gross refused to confer with her. During the proceedings, Gross continued to provide the court with responses that did not address the questions asked of him. Gross also repeatedly referred to the trial judge as "Mister Huck."

The court asked Gross whether he had any challenges for cause. Gross responded, "I object. I object to this whole jury, this whole trial. I do not consent to any of this." Outside the venire panel's hearing and before the district court seated the jury, Krasnoff asked, "Mr. Gross, do you want the shackles removed?" Gross responded, "No." The court replied, "All right." The parties then went through their challenges and the jury was seated.

The government delivered its opening statement. When the court asked whether Gross intended to present an opening, Gross said, "I reserve my opening statement." The government then called its first witness.

### 2.    The Government's Case

Because the government prevailed at trial in every count against Gross, we present the facts of the government's case in the

light most favorable to the verdict. *See United States v. Dixon*, 901 F.3d 1322, 1335 (11th Cir. 2018).

The bulk of the government's case against Gross relied on testimony by undercover FBI Agent George Nau. Nau, with the username "Greg Soccerdad," entered a Kik[3] chatroom titled "Family Tabu No Limits." In that chatroom, users traded child pornography and some claimed to be sexually active with minors.

Nau encountered an assistant administrator of the chatroom. This assistant administrator's screen name was Chase Ordonez, and his username was "WillG880." WillG880 uploaded child pornography to the chatroom and claimed to be sexually active with a young family member who was a minor. Nau began chatting by direct message with WillG880 and did so for almost one year. The government introduced in evidence these direct messages ("DMs") between Nau and WillG880 from June 2020 through June 2021. These messages show that WillG880 asked for pictures of Agent Nau's fictitious eleven-year-old daughter and expressed interest in having sex with her. He also asked Nau for child pornography videos. WillG880 told Nau that he had been sexually active with a 14-year-old relative when he was twenty-five years old and that he was now thirty years old, living in the Miami area.

---

[3] The Kik application is a social-media messaging platform on which users communicate with each other. Users on the Kik app could use any username and Kik did not verify email accounts or require phone numbers to create an account.

Nau testified about the explicit conversations he had with WillG880.  In particular, he said that WillG880 sent him images or videos of child pornography on dates corresponding with those in the seven counts of the indictment.

Aside from the fact that Gross's name matched the first name and first initial of the username WillG880, Nau testified, the person Nau chatted with shared other information that led law enforcement to identify the user as Gross.  Nau explained that WillG880 had told him that he worked at a grocery store, that he once lived in Miami Lakes, and that he was 6'1" and thirty years old.  Gross's driver's license, which was admitted into evidence, revealed the same height and age.  And Gross's former girlfriend, Victoria Medina, who testified later in the trial, recalled that Gross told her he once lived in Miami Lakes.

During their correspondence, WillG880 sent photographs of himself to Nau from his workplace.  The face in the photograph WillG880 sent had a birthmark on the subject's forehead.  That birthmark matched one on Gross's forehead.

Law enforcement also confirmed that Gross worked at a grocery store.  In fact, evidence showed that Gross was at work when WillG880 claimed to be at work and was sending the photos.  Law enforcement further determined that the photos WillG880 sent were taken at the grocery store where Gross worked.

Besides that, Nau testified that at one point, WillG880 sent him a picture of his penis.  And Nau said that WillG880 mentioned

that he had a six-foot-tall girlfriend and broke up with her in January 2021, at the same time he left his job at the grocery store.

Gross's former girlfriend, Medina, later confirmed during trial that she was six feet tall and broke up with Gross in January 2021. Medina also identified the picture of the penis that WillG880 sent to Nau as Gross's penis, taken at the home she had shared with Gross. And Medina identified the person in WillG880's selfie photos as Gross.

The government also presented forensic analysis of (1) the devices it seized from Gross's home while executing a search warrant and (2) data from the IP addresses WillG880 used. Records obtained from Kik showed that WillG880 accessed the app from Gross's residence, Medina's family's home, and the grocery store where Gross worked.

Bryan Jordan, an information-technology specialist and forensic examiner with the FBI, testified as an expert witness. Noting that Adrianna Barbee, another forensic examiner, had extracted data from Gross's Samsung cellphone, Jordan explained that he had reviewed Barbee's work, and it followed best practices. He also testified that he did his own analysis. Based on remnants of the Kik application's installation on the Samsung phone, Jordan concluded that the Kik application had been on the phone at one point, but the app was not present on the phone at the time of the extraction.

After Jordan testified, the court excused the jury, and the parties discussed logistics of the case. The court asked Gross if he planned on making an opening statement. Gross said he did. Then

22-11543                Opinion of the Court                15

the parties turned to the jury instructions and Gross asked the court, "Is there any way I could ask to have my shackles, and my arm un - - removed, shackles removed [from] my arm." He also wanted the record to reflect that he had been "in shackles and bound to one hand." The court responded that it could accommodate him and directed the Marshals to do so.

The parties returned to the issue of the jury instructions and whether Gross would be testifying. The court asked Krasnoff if she had spoken to Gross about testifying. She responded that she had not, so the court asked her to do so. This elicited commentary between the government and the court as follows:

> GOVERNMENT: I don't know if the defendant is aware that if he does not testify, or present evidence, he does not give an opening statement. So I think that needs to be made clear.
>
> THE COURT: I didn't know that. If he doesn't testify, he's not entitled to an opening statement?
>
> GOVERNMENT: Because he reserved, Your Honor, no, he is not.
>
> THE COURT: Is there a case on that?
>
> GOVERNMENT: I can find one, Your Honor.

THE COURT:  A rule.

GOVERNMENT: I'm happy to find one.

THE COURT: Do I have discretion to allow it anyway?

GOVERNMENT: I'm sorry, Your Honor?

THE COURT: Do I have discretion to allow it anyway?  Because I am inclined to allow him to make his statement.

GOVERNMENT: I would need to check that, Judge.  It's my understanding that unless he makes an opening statement at the beginning of the case, if he reserves until the end of the Government's case in chief, he must present evidence in order to be able to have that ability.

The government never cited a case, and the issue never arose again during the course of the trial.

After this interlude, the government called FBI Special Agent Kim Jennette as a witness.  Jennette testified that she reviewed the extraction report of the three devices law enforcement seized when they arrested Gross—the Apple iPhone, Samsung

Android, and Dell laptop.  Jennette reported that the government had found no child pornography or chats relating to child pornography on any of the devices.  As for the Samsung cellphone, Jennette said she found that the Kik application had been downloaded on the device.  When she performed a manual review of the device, though, she did not see the Kik application.  Thus, Jennette explained, the application either was in a hidden folder that she did not find or it had been deleted.  Jennette relied on the forensic examiners' reports for her testimony about the Kik application.

When the government rested its case and the jury was excused, Gross moved for a judgment of acquittal.  The district court denied the motion.

Then the court called Gross and Krasnoff to a sidebar so it could find out whether Gross intended to testify or present any other evidence:

> And now the question is are you going to testify, put any evidence on?  You know you have the right to testify or you have the right to remain silent.  You've probably heard the limiting instructions, I've instructed the jury if you do not want to testify and do not testify, the jury cannot consider that.  In other words, it's completely your decision.
>
> Consult with counsel, and now is the time to make that decision.  Are you going to testify or not testify before the

> jury?  You don't have to testify, or if you
> think it's in your best interest to testify,
> of course you can testify.  That's your
> decision and your decision alone, but I
> need to know now because now is the
> time for you to testify or put on any evi-
> dence, as I mentioned.

When Gross said he was having trouble deciding, the court gave him a few minutes to think about it and encouraged him to speak with Krasnoff.  After a few minutes, Gross informed the court, "as a living man, William Gross, Jr., will be testifying."  The court replied, "Okay.  And you can now make your opening statement."

### 3.    The Defense Case

Gross made an opening statement to the jury.  He said, "I'm not a lawyer.  I'm just a man, just a man right here in front of you. Mr. William Gross. . . . I never wanted to go pro se, it was not my intention. . . . Never wanted to represent myself.  I just wanted justice for what was done to me. "  During his opening statement, Gross complained that he was "incarcerated in federal prison." And he admitted that he had "ruined a lot of lives" but said, "[T]his is not an admission of guilt."

After his opening statement, Gross testified briefly.  He opined that the FBI violated his rights when it arrested him and searched his home.

On cross-examination, the government asked Gross whether he had chatted with Nau on Kik or sent pictures or videos of child pornography. Gross denied that he had. Gross also denied that law enforcement had fully advised him of his *Miranda* rights and that he had initialed a confession in the case. Still, though, Gross admitted the selfies and penis photographs were of him. Even so, Gross denied that he was WillG880 and that he had sent the pictures.

Gross rested his case and renewed his motion for judgment of acquittal, which the court denied.

### 4.    The Government's Rebuttal Case

The government presented a rebuttal case. During its rebuttal, the government introduced a post-arrest confession Gross gave. FBI Special Agent Rick Enriquez explained that after Gross's arrest, Enriquez had read Gross his *Miranda* rights, made sure he understood the warning, interviewed Gross, and then obtained a signed statement from him. In the statement, Gross admitted to using the Kik messenger to communicate with others about sex with minor children. He confessed to communicating with the user "Greg Soccer" on and off for several months. And he admitted that, during those interactions, he had sent child pornography images and videos.

In another part of his statement, Gross said, "Using Kik messenger, I have communicated with a handful of groups that were into deviant sexual content, including child pornography." As Gross described it, "for two years, I have been looking at . . .

pornography of minor children. I have seen videos and images of boys and girls of various ages having sex with adults." Finally, Gross confessed that twice in the past, he had received images of a penis from a person who looked to be fifteen years of age, but he claimed he had never had sexual contact with a child.

Gross presented no other evidence.

### 5.    Gross's Closing Argument

In his closing argument, Gross said, "[O]ne of the reasons why I would say I'm representing myself today is [] my rights as a human w[ere] violated." He argued no direct evidence linked him to the crimes charged; only circumstantial evidence existed of his involvement. Gross also complained, "I was brought to this court-room in shackles. Shackles like a slave. If you look outside of this courthouse and really pay attention, this is modern day slavery. . . . They bring us in shackles from across the street underground." The government objected to this statement, and the court in-structed the jury that Gross's closing arguments were not evidence.

Gross continued, "I'm not an attorney, I was not ready for this case. I was on lockdown at FDC Miami, two weeks before - -" The court again told Gross to refrain from these comments, but Gross repeated, "I was not ready for this case at all. At all. It was kept from me. Kept from the federal government that had me in prison."

C.    Verdict, Sentencing, and Appeal

The jury found Gross guilty of all seven counts of the indictment.

At Gross's sentencing hearing, Krasnoff remained as standby counsel.  Gross's advisory guideline range fell between 235 and 293 months, but with a 240-month maximum sentence.

Before announcing the sentence, the court emphasized that Gross had been "extremely uncooperative and difficult to deal with."  In the district court's view, his behavior represented "one of the most egregious cases of obstruction of justice that [the court had] seen based on [Gross's] perjury."  The court found that Gross had lied about not receiving his *Miranda* rights, making his post-arrest statement, sending pornography, and sending selfies.  The district court sentenced Gross to the statutory maximum of 240 months' imprisonment for each count, to be served concurrently.

Gross timely filed his Notice of Appeal and the federal public defender was assigned to represent Gross in this appeal.

## II. DISCUSSION

A.    Sixth Amendment Right to Assistance of Counsel

Gross contends the district court violated his Sixth Amendment right to counsel by requiring him to represent himself when he did not "clearly and unequivocally" declare a desire to do so.  In support of his contention, Gross points to certain remarks he made during the proceedings:  (1) his statement at the status conference

when he said he "was representing [himself] in propria persona" but he was "objecting to pro se and any private attorneys or public defenders or officers of the court"; (2) his statement at the status conference in response to the court's question of whether Gross understood that the court was going to allow him to represent himself: "I understand, but I am objecting to filing as pro se"; (3) his statement at the *Faretta* hearing that he was "not here to proceed on my own. I am here to object to all attorney types"; (4) his statement at the *Faretta* hearing in response to the court's remark that if Gross represented himself he would have to do all the legal work, "I understand, but I'm not proceeding pro se"; (5) his objection on the second day of trial to the court's characterization that he requested to represent himself; and (6) his remark in his opening statement that he "never wanted to go pro se" and that he "never wanted to represent himself."

Gross also argues that he did not knowingly and voluntarily make any waiver of his right to counsel. According to Gross, the *Faretta* hearing made it clear that he was ill-prepared to represent himself. He never finished high school, was a first-time offender with no legal experience with the criminal-justice system, had no formal legal training, and had minimal contact with his appointed counsel. We disagree with Gross's view of the record.

### 1. Relevant Standard

The Sixth Amendment to the Constitution entitles an accused in criminal proceedings to the right to the assistance of counsel for his defense. U.S. Const. amend. VI. Once an adversarial

judicial process has begun, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical stages" of the criminal proceedings. *Iowa v. Tovar*, 541 U.S. 77, 87 (2004); *United States v. Wade*, 388 U.S. 218, 227-28 (1967). Although this right "attaches at the pleading stage of the criminal process," *Boyd v. Dutton*, 405 U.S. 1, 2 (1972), the Supreme Court has held that "'forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so.'" *United States v. Hakim*, 30 F.4th 1310, 1321 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 776 (2023) (quoting *Faretta*, 422 U.S. at 817). Indeed, the right to represent oneself is "'necessarily implied by the structure of the [Sixth] Amendment.'" *Id.* (quoting *Faretta*, 422 U.S. at 819). In other words, the Sixth Amendment "'does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense.'" *Id.* (quoting *Faretta*, 422 U.S. at 819).

Because a defendant cannot simultaneously assert the right to counsel and the right to self-representation, a defendant can exercise one right only if he waives the other. *Id.* at 1322. But an accused who represents himself "'relinquishes . . . many of the traditional benefits associated with the right to counsel.'" *Id.* (quoting *Faretta*, 422 U.S. at 835). So he must "knowingly and intelligently" waive his right to counsel. *Hakim*, 30 F.4th at 1322; *see also United States v. Owen*, 963 F.3d 1040, 1048 (11th Cir. 2020). If the defendant waived counsel without the requisite knowledge, he has been deprived of the right to counsel at any critical stage of the criminal process at which he lacked a lawyer. *Hakim*, 30 F.4th at 1322.

Whether a defendant's purported waiver of his right to counsel was knowing and voluntary presents a mixed question of law and fact that we review de novo. *United States v. Garey*, 540 F.3d 1253, 1268 (11th Cir. 2008) (en banc).  On direct appeal, the government bears the burden of proving the validity of the waiver.  *Hakim*, 30 F.4th at 1318 (quoting *United States v. Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995)).

## 2. Discussion

*Garey* and its progeny control our analysis.  In *Garey*, an uncooperative defendant "adamantly and knowingly" rejected counsel but also refused to affirmatively invoke his right to self-representation.  *Garey*, 540 F.3d at 1257.  We recognized that a "valid waiver of counsel [could] occur not only when a cooperative defendant affirmatively invokes his right to self-representation, but also when an uncooperative defendant rejects the only counsel to which he is constitutionally entitled, understanding his only alternative is self-representation with its many attendant dangers."  *Id.* at 1265.  As we explained, a defendant who engages in that activity, through his conduct, knowingly and voluntarily waives his right to counsel.

We recently applied *Garey* in *Hakim*.  Hakim engaged in behavior similar to Gross's:  he made sovereign-citizen-type statements that were, at times, incoherent and frivolous.  *See Hakim*, 30 F.4th at 1315-17.  And he used "dilatory tactics and obscurantism" that continued for months.  *Id.* at 1316.  We reiterated our holding in *Garey* that, when a court is "confronted with a defendant . . . who

refuses to provide clear answers to questions regarding his Sixth Amendment rights, it is enough for the court to inform the defendant unambiguously of the penalties he faces if convicted." *Id.* at 1323–24 (quoting *Garey*, 540 F.3d at 1267 (emphasis omitted)). Although we determined that Hakim had not knowingly waived his right to counsel, we did so only because during the pretrial stage, the court incorrectly advised Hakim of the maximum penalty he faced. *Id.* As a result, Hakim was not aware of the penal consequences of a conviction, so we concluded he could not have knowingly waived his Sixth Amendment right to counsel. *Id.* at 1323-1326.

We cannot say the same about Gross. The district court correctly informed him of the maximum penalties he faced upon conviction. So the error in *Hakim* cannot serve as a basis for declining to apply *Garey* here. And other than that error, Gross's case is materially indistinguishable from Hakim's, where we suggested that *Garey* would have warranted the conclusion that Hakim had voluntarily waived his right to counsel, but for the district court's mistake in advising Hakim about the maximum penalties.

Taking *Garey* and *Hakim* together, we reject Gross's argument that the district court violated his Sixth Amendment rights by requiring him to proceed pro se. Gross voluntarily waived counsel through his actions. He repeatedly said he was "representing [him]self in propria persona" and he was "objecting to . . . any private attorneys or public defenders or officers of this court." Those

were clear statements that he (1) was representing himself, and (2) was refusing court-appointed counsel.

To be sure, Gross also said, "I am objecting to pro se." But given his several assertions simultaneously with that remark that he was representing himself and his rejections of court-appointed counsel," Gross's "object[ion]" to proceeding pro se does not change the conclusion. By repeatedly rejecting appointed counsel, Gross voluntarily chose to proceed pro se just as much as if he had made an affirmative request to do so, which, in fact, his persistent insistence on "representing [him]self in propia persona" was. At a minimum, Gross voluntarily waived his right to counsel through his conduct.

Gross also knowingly waived his right to counsel. We consider eight factors to determine whether a defendant knowingly relinquishes his right to be represented by counsel:

> (1) the defendant's age, educational background, and physical and mental health; (2) the extent of the defendant's contact with lawyers prior to trial; (3) the defendant's knowledge of the nature of the charges, possible defenses, and penalties; (4) the defendant's understanding of rules of procedure, evidence, and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed, and the extent to which that counsel aided the defendant; (7)

> mistreatment or coercion of the defend-
> ant; and (8) whether the defendant was
> trying to manipulate the events of the
> trial.

*Owen*, 963 F.3d at 1049.

Here, at both hearings about Gross's self-representation, the record reflects that Gross was not under the influence of any medication; he had never been seen for any mental-health issues; and no medication, drugs, alcohol, or mental-health concerns affected his ability to understand the proceedings. Gross also had reached the twelfth grade in high school, even though he had not graduated. And Gross maintained steady employment before his arrest. Nothing about his age, education, or health prevented him from knowingly waiving his right to counsel.

As for Gross's contact with counsel, though Gross had interacted minimally with Krasnoff before trial, that was his own choice. Indeed, Gross refused to meet with Krasnoff when she tried to visit him at the jail.

And in any case, the district court discussed the nature and consequences of the proceedings with Gross. During that discussion, Gross exhibited an understanding of the charges, possible punishments, basic trial procedure, and the hazards of representing himself. *See Garey*, 540 F.3d at 1265-66. He showed he was capable of assisting in his defense (had he wanted to be represented by counsel) and he understood the adversarial nature of the legal process.

Throughout the district-court proceedings, Gross filed various documents. And his performance at trial—including moving for judgment of acquittal—further showed that he was intelligent and capable of representing himself.

In context, Gross's behavior throughout the pretrial and trial phases strongly suggests that he was engaging in behavior that was calculated and manipulative. But a defendant "cannot use the right to counsel as a means to manipulate the court and cause delay." *United States v. Graham*, 643 F.3d 885, 894 (11th Cir. 2011). And this type of conduct reflects a knowing and voluntary waiver of the right to counsel. *United States v. Amede*, 977 F.3d 1086, 1111 (11th Cir. 2020) (uncooperative conduct throughout case evinced a knowing and voluntary waiver); *Owen*, 963 F.3d at 1051-52 ("[e]vidence of [a defendant's] manipulation or intentional delay implies [his] greater understanding of the proceedings and an understanding of the risks and complexities of a criminal trial.").

Plus, as we've noted, unlike in *Hakim*, the district court correctly advised Gross of the possible maximum sentence. And it repeatedly warned Gross of the dangers of representing himself, emphasizing that Gross should strongly consider accepting Krasnoff as his attorney. Gross's interaction with the court requires us to conclude that Gross weighed his options but knowingly and voluntarily decided to forego representation. As in *Garey*, we are satisfied that Gross waived his right to counsel through his "uncooperative conduct, and that he did so with an understanding of the dangers of self-representation." *Garey*, 540 F.3d at 1270.

B.    Shackling

Next, Gross asserts that the district court violated his right to due process and a fair trial when it failed to remove his shackles during trial.  Gross recognizes that certain circumstances can present themselves in which courts may require defendants to wear shackles, but he says those circumstances were not present here. He points out that he was charged with distributing child pornography and he was a first-time offender with no history of violence. Neither the court, the prosecutor, nor the Marshals had identified any reason for the shackling.  Despite these facts, Gross complains, he remained shackled in front of the jury for the majority of his criminal trial.  On this record, we reject Gross's argument.

### 1.  Relevant Standard

We usually review a shackling determination for abuse of discretion.  *United States v. Moore*, 954 F.3d 1322, 1329 (11th Cir. 2020).  But here, Gross did not raise the issue of shackling with the district court.  So we review for plain error.  *Id.* (citing *Puckett v. United States*, 556 U.S. 129, 135 (2009) and *United States v. Davis*, 754 F.3d 278, 283 (5th Cir. 2014) (reasoning because the defendant did not object during the bench trial to the requirement that he stand trial handcuffed and shackled, review was limited to plain error)).

Although Gross contends we should apply plenary review, we disagree.  In *Moore*, we addressed a defendant's shackling claim. There, the defendant did not object to the shackles in the district court.  Thus, we held that plain-error review applied.  *Moore*, 954

F.3d at 1329.  The same is true here.  Gross was obviously aware of his shackling throughout trial.  Yet he never objected, even though standby counsel specifically asked him in the judge's presence whether he wanted his shackles removed.  In fact, he expressly rejected standby counsel's suggestion of removal.[4]

To show plain error, Gross must establish three conditions. "First, there must be an error that has not been intentionally relinquished or abandoned.  Second, the error must be plain—that is to say, clear or obvious.  Third, the error must have affected the defendant's substantial rights."  *United States v. Hawkins*, 934 F.3d 1251, 1264 (11th Cir. 2019) (citation and internal quotation marks omitted).  If these conditions are met, we may exercise our discretion to consider and correct a forfeited error, but only if the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings."  *Id.*  (citation and internal quotation marks omitted).  Taken together, a defendant must show "(1) error; (2) that is plain; (3) that affects his substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Lewis*, 40 F.4th 1229, 1246 (11th Cir. 2022).

---

[4] For this reason, the shackling throughout trial was arguably invited error that we are precluded from reviewing.  *See United States v. Harris*, 443 F.3d 822, 824 (11th Cir. 2006); *United States v. Maradiaga*, 987 F.3d 1315, 1322 (11th Cir. 2021) (citing *Harris*, 443 F.3d at 823-24).  But because it makes no difference to the resolution of this claim, we assume without deciding that Gross did not invite error and review his claim under the plain-error standard.

We determine whether an error had substantial influence on the outcome by weighing the record as a whole, *see United States v. Montalvo-Murillo*, 495 U.S. 711, 722 (1990), and examining "the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt," *United States v. Reed*, 700 F.2d 638, 646 (11th Cir. 1983) (citation and internal quotations marks omitted). The party asserting the error bears the burden of demonstrating that his substantial rights were affected. *United States v. Cameron*, 907 F.2d 1051, 1059 (11th Cir. 1990).

## 2. Discussion

In *Deck v. Missouri*, the Supreme Court held that the routine use of visible shackles on defendants during a criminal trial, without "the presence of a special need"—such as courtroom security—was unconstitutional. 544 U.S. 622, 624, 626 (2005). As the Court explained, shackling can "(1) affect the presumption of innocence, (2) infringe on defendants' ability to communicate with their lawyers and participate in their defense, and (3) impugn the dignity of the judicial process[,]" including the respectful treatment of defendants. *Id.*at 630-31. Still, though, the Court noted that in some circumstances, "these perils of shackling are unavoidable." *Id.* at 632. Sometimes defendants are demonstrably dangerous and pose considerable risks to others in the courtroom. In these situations, judges may "take account of special circumstances, including security concerns, that may call for shackling." *Id.* at 633.

Here, the district court did not make any finding of a security need to justify the use of visible physical restraints on Gross under *Deck*. So we must consider whether Gross's shackling amounted to a due-process violation. *Id.* We conclude that, in the particular circumstances of this case, it did not.

*United States v. Wilson*, 979 F.3d 889 (11th Cir. 2020), governs our analysis. There, Wilson appeared at trial before the jury in prison clothes and shackles. *Id.* at 915. He claimed this was inherently prejudicial. *Id.* We agreed, of course, that, generally speaking, a defendant's appearance in shackles "is inherently prejudicial because it reveals to the jury the defendant is in jail and could affect a juror's ability to presume the defendant is innocent." *Id.* (citing *Deck*, 544 U.S. at 630-32 (visible shackles); *Estelle v. Williams*, 425 U.S. 501, 503-04 (1976) (prison clothes); *Moore*, 954 F.3d at 1329 (shackles) and *United States v. Shabazz*, 887 F.3d 1204, 1218 (11th Cir. 2018) (prison clothes)).

But we determined that, based on Wilson's arguments at trial, the shackles were not, in fact, prejudicial. Rather, Wilson chose to use them in his defense. During opening statements and throughout the trial, Wilson, (who, like Gross, proceeded pro se) told the jury that he was in jail, emphasized how long he had been there, and noted that he was still incarcerated. *Id.* In other words, as we explained, Wilson "intentionally and strategically tried to use his appearance and the fact of his continued incarceration to his advantage at trial." *Id.* He also made no contemporaneous objection to his prison clothes and shackling. *Id.* Rather, we said, Wilson

purposely pointed them out "to gain the jury's sympathy by repeatedly stressing the length and alleged pretext of his incarceration." *Id.*

We concluded that prison clothes and shackling were not prejudicial when the defendant "injects his incarceration into the case." *Id.* We relied on our decision in *Shabazz*, where we said, "a defendant may not create[ ] his own problem by wearing jail clothes for strategic advantage and then seek reversal because he chose to wear those clothes." 887 F.3d at 1218 (quotation marks omitted)).

Gross's situation presents an even less compelling basis for finding error. For starters, as we've mentioned, standby counsel specifically asked Gross before trial if he wanted his shackles removed and Gross flatly replied, "No." And when Gross changed his mind later in the proceedings, the shackles were removed.

Not only that, but like Wilson, Gross discussed his incarceration in both his opening statement and closing argument and sought to use it to leverage the jury's sympathy. Gross told the jury he was "incarcerated in federal prison" during his opening statement. And during his closing argument, Gross emphasized, "I was brought to this courtroom in shackles. Shackles like a slave.… They bring us in shackles from across the street underground." He continued, "If I could bring my own witnesses because, again, I'm not an attorney, I was not ready for this case. I was on lockdown at FDC Miami, two weeks before—." And despite the court's

warning to stick to the evidence, Gross again told the jury that "the federal government . . . had me in prison."

Gross cannot now seek to use the shackles he wielded as a sword in his defense as a shield on appeal.

And even if Gross could show plain error—he can't for the reasons we've explained—any error did not seriously affect his substantial rights. Gross cannot show a reasonable probability that, but for the alleged error, the outcome of the trial would have been different. *See United States v. McLellan*, 958 F.3d 1110, 1119 (11th Cir. 2020). Rather, strong evidence of Gross's guilt exists.

First, the username "WillG880" incorporates Gross's first name and the first initial of his last name. Second, WillG880 said he was the same height (6'1") and age (thirty) as Gross. Third, WillG880 mentioned he worked at a grocery store, just as Gross did. Fourth, WillG880 said he had once lived in Miami Lakes. Gross had as well, according to his ex-girlfriend. Fifth, both WillG880 and Gross left their jobs in January 2021. Sixth, both WillG880 and Gross had girlfriends who were six feet tall and with whom they broke up in January 2021. Seventh, WillG880 accessed and sent messages to Nau while he was logged into the wi-fi at Gross's home, workplace, and girlfriend's mother's home, as the IP addresses associated with the DMs revealed.

And in some of the more incriminating evidence presented at trial, WillG880 sent pictures of his face and penis to Nau that bore Gross's unique physical characteristics and were identified as Gross. Even Gross conceded that the photographs were of him.

Plus, some of the pictures were sent from the grocery store where Gross worked at times Gross was working. And the photograph of Gross's penis was taken in Gross's home. Finally, Gross made incriminating statements in his post-*Miranda* confession.

Taking all of this evidence together, Gross's guilt was overwhelming. It is unlikely that the outcome of the trial would have been different if Gross were not shackled.

For all of these reasons, we reject Gross's shackling claim.

C.    Right to Confront Witnesses

Gross also asserts that Agent Jennette's testimony violated his Confrontation Clause rights. We disagree.

As we've noted, Jennette testified that the Kik app had been installed on the Samsung Android cellphone law enforcement seized from Gross's home, but the app had been deleted or hidden sometime after it was installed. During her testimony, Jennette admitted that another forensic examiner had prepared the extraction report upon which she relied for her testimony, and she was neither involved in the preparation of the report nor present during the creation of the report.

Gross argues that Jennette's testimony based on the extraction report violates the Confrontation Clause. He notes that a forensic analyst's certification prepared in connection with a criminal investigation is "testimonial" and therefore is within the requirements of the Confrontation Clause. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 317-24 (2009)). So, Gross contends, a forensic analyst

36                    Opinion of the Court                    22-11543

who did not perform or observe a particular forensic test cannot testify from the forensic report certifying the test's results.

### 1. Relevant Standard

Normally, we review a district court's evidentiary decisions for abuse of discretion. *Hawkins*, 934 F.3d at 1264. But Gross did not contemporaneously object to Jennette's testimony as a violation of his rights under the Confrontation Clause, so we apply plain-error review. *Id.*; *see also United States v. Smith*, 459 F.3d 1276, 1287 (11th Cir. 2006). As we've explained, under plain-error review, "there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, 535 U.S. 625, 631-32 (2002) (citations and internal quotation marks omitted).[5]

---

[5] The harmless-error doctrine applies to violations of the Confrontation Clause (and other erroneous evidentiary rulings). *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *United States v. Edwards*, 211 F.3d 1355, 1359 (11th Cir. 2000). An error is harmless unless "there is a reasonable likelihood that [it] affected the defendant's substantial rights." *Hawkins*, 905 F.2d at 1493. This Court need not reverse a conviction if the evidentiary error "had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict." *United States v. Fortenberry*, 971 F.2d 717, 722 (11th Cir. 1992).

## 2. Discussion

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. As the Supreme Court explained in *Crawford v. Washington,* the Confrontation Clause prohibits the admission of out-of-court statements that are testimonial unless the declarant is unavailable and the defendant had a previous opportunity to cross-examine the declarant. 541 U.S. 36, 51–52 (2004). The Confrontation Clause "ensure[s] the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). The Confrontation Clause includes the right to cross-examine witnesses. *United States v. Diaz*, 26 F.3d 1533, 1539 (11th Cir. 1994).

Here, Gross contends the extraction report and its conclusion that the Kik app had been downloaded onto the Samsung cellphone and then later removed were testimonial in nature. After all, the report was prepared in anticipation of a criminal trial and the conclusion of forensic analyst Barbee about the Kik app was a declaration "made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51; *see also Melendez-Diaz,* 557 U.S. at 321-24 and *United States v. Charles*, 722 F.3d 1319, 1323 (11th Cir. 2013). Not only that, Gross continues, but Jennette clearly testified that she was merely adopting the conclusion contained in the extraction report. Yet the government never claimed that forensic

analyst Barbee was unavailable or that Gross had a prior opportunity to cross-examine Barbee.

Gross argues that a key piece of evidence—that his cellphone had the Kik app on it and the app was later hidden or deleted—went directly to the issue of whether Gross was the person who sent the images under the name WillG880. The testimony was damaging for obvious reasons—the images and videos were sent to Nau through the Kik app. And Gross contends the error infected the integrity and public reputation of the proceedings. We disagree.

The problem for Gross is that, by the time Jennette testified, forensic examiner Jordan had already testified about and adopted the contents of the same extraction report Barbee prepared. Jordan, who was qualified as an expert, explained that he had reviewed Barbee's report and concluded that it had followed best practices. Then, Jordan testified, based on his own expert analysis, he also found that the Samsung phone once had the Kik application installed on it. Gross had the opportunity to cross-examine Jordan, including about the report.

And on appeal, Gross does not challenge the admission of Jordan's expert testimony about the report or the Kik app, so any such challenge is abandoned. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680-82 (11th Cir. 2014). Gross was able to cross-examine Jordan, who as an expert effectively adopted the report as his own, on the report's methodology and conclusions. Plus, Jennette did not testify to anything different than Jordan did about the

report.  Rather, Jennette's testimony about the Kik app was merely cumulative.  As a result, even if any error occurred, it was harmless. *See United States v. Jones*, 601 F.3d 1247, 1264 (11th Cir. 2010) (concluding that a Confrontation Clause violation was harmless beyond a reasonable doubt when the challenged evidence was "cumulative" and the government's case was "strong").

We therefore reject Gross's Confrontation Clause argument.

D.    Opening Statement/Gross's Trial Testimony

Gross argues that the district court coerced him into testifying against himself at trial, in violation of the Fifth Amendment right not to incriminate himself.  In Gross's view, the court should have explained to Gross that deferring his opening statement at the beginning of trial would cause Gross to waive his opening statement unless he presented a defense case.  Because Gross's evidence consisted solely of his own testimony, the circumstances left him with the difficult choice of either (1) exercising his right not to testify and foregoing making an opening statement or (2) making an opening statement and being forced to testify.  Gross ultimately chose to testify. He points to the trial transcript and says that after he expressed his decision to testify, the court only then told him "you can now make your opening statement."

Plus, Gross continues, the decision to testify prejudiced him because he had to face cross-examination on the ultimate issues at trial.  And Gross's testimony allowed the government to introduce his post-arrest admission, further solidifying the case against him.

Not only that, but the district court enhanced Gross's sentence because it found he had obstructed justice based, at least in part, on Gross's lies under oath. We conclude that Gross's claim lacks merit.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. We usually review constitutional claims de novo. But Gross did not raise this issue in the district court. So we review for plain error. *See Lewis*, 40 F.4th at 1246.

Gross cannot satisfy the plain-error standard. He has cited no rule or case that precludes a criminal defendant from giving a deferred opening statement if he does not put on a case. And to the contrary, we have recognized that "[t]he timing and making of opening statements is within the discretion of the trial judge."[6] *United States v. Zielie,* 734 F.2d 1447, 1455 (11th Cir. 1984), *abrogated on other grounds by United States v. Chestang,* 849 F.2d 528, 531 (11th Cir. 1988). Here, the court never conditioned its granting of Gross's opening statement on the requirement that Gross present a case. The opposite is true: when the government suggested Gross would have to put on a case if he wanted to make a deferred

---

[6] In *Zielie*, we found no error when a district court denied counsel the opportunity to make an opening statement when defense counsel initially deferred giving a statement and then later advised that he would call no witnesses and introduce no evidence. *Zielie*, 734 F.2d at 1455. We did not conclude that defense counsel was prohibited from giving an opening statement. Rather, we merely found that it was within the district court's discretion to preclude the statement. *Id.*

opening statement, the district court expressed its disagreement. In fact, the court stated it was "inclined to allow [Gross] to make his statement," regardless of whether he took the stand or presented other evidence.

The district court also repeatedly reminded Gross that he had the right to testify or to remain silent. Not only that, but the court warned Gross to consult with his standby counsel about whether he should testify and what the ramifications of his testimony would be. In response, Gross took a few minutes to speak with Krasnoff and then informed the court that he would be testifying.

The context of the interaction between the court and Gross shows that the court did not allow Gross to make an opening statement *because* he had offered to testify. Rather, the exchange shows that the court made sure Gross knew he did not need to testify and allowed him to speak to standby counsel to make a better decision about whether to exercise his right not to testify.

In sum, Gross has failed to show any error, let alone plain error, that the district court somehow forced him into nonvoluntarily relinquishing his Fifth Amendment right not to testify against himself.

E.    Cumulative Error

Our review of cumulative trial error considers all errors preserved and unpreserved in the context of the trial as a whole to determine whether the defendant received a fair trial. *United States*

*v. House*, 684 F.3d 1173, 1197 (11th Cir. 2012). Cumulative errors require reversal of a conviction if they have a substantial influence on the outcome of a case. *United States v. Frazier*, 387 F.3d 1244, 1266 n.20 (11th Cir. 2004) (en banc).

We have acknowledged that "the cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005). But no cumulative error exists when a criminal defendant cannot establish that the combined errors affected his substantial rights. *United States v. Foley*, 508 F.3d 627, 638 (11th Cir. 2007). And even where a district court makes errors, a defendant's substantial rights are not affected if "properly admitted evidence sufficiently established [his] guilt." *United States v. Adams*, 74 F.3d 1093, 1100 (11th Cir. 1996).

Because we conclude that the district court committed no errors, it necessarily did not engage in cumulative error. But even assuming that some aspect or aspects of the district-court proceedings we've discussed were error, any error did not affect Gross's substantial rights. The properly admitted evidence overwhelmingly established his guilt in this case.

### III.    CONCLUSION

For the foregoing reasons, we reject Gross's arguments and affirm his convictions.

**AFFIRMED.**